IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| SUSAN POLGAR, | § | |
| _Plaintiff,_ | § | |
| | § | CIVIL ACTION NO. |
| v. | § | |
| | § | 5 - 08 CV 00169 - C |
| UNITED STATES OF AMERICA | § | |
| CHESS FEDERATION, INC. | § | |
| and | § | |
| BILL GOICHBERG, JIM BERRY, | § | |
| RANDY BAUER, and | § | |
| RANDALL HOUGH, all Individually | § | |
| and in their  Representative Capacities as | § | |
| Members of the  Executive Board of the | § | |
| United States of  America Chess Federation; | § | |
| BILL HALL, Individually and in his | § | |
| Representative Capacity as Executive | § | |
| Director of the United States of America | § | |
| Chess  Federation; | § | |
| BRIAN MOTTERSHEAD; | § | |
| HAL BOGNER; | § | |
| CHESS MAGNET, L.L.C.; | § | |
| CONTINENTAL CHESS INCORPORATED; | § | |
| JEROME HANKEN; | § | |
| BRIAN LAFFERTY; | § | |
| SAM SLOAN; | § | |
| KARL S. KRONENBERGER; and | § | |
| KRONENBERGER BURGOYNE, L.L.P.; | § | |
| | § | |
| _Defendants._ | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE SAM R. CUMMINGS:

COMES NOW SUSAN POLGAR, Plaintiff, complaining of the UNITED STATES OF

AMERICA CHESS FEDERATION, INC. and BILL GOICHBERG, JIM BERRY, RANDY

BAUER, and RANDALL HOUGH, all Individually and in their  Representative Capacities as

---

Members of the Executive Board of the United States of America Chess Federation, Inc.; BILL HALL, Individually and in his Representative Capacity as Executive Director of the United States of America Chess Federation, Inc.; BRIAN MOTTERSHEAD; HAL BOGNER;CHESS MAGNET, L.L.C.; CONTINENTAL CHESS INCORPORATED; JEROME HANKEN; BRIAN LAFFERTY; SAM SLOAN; KARL S. KRONENBERGER; and KRONENBERGER BURGOYNE, L.L.P.; hereinafter referred to as Defendants, and for cause of action would respectfully show the Court as follows:

**I.**
**PARTIES**

1.    Plaintiff is an individual and resident of Lubbock, Lubbock County, Texas.

2.    Defendant UNITED STATES OF AMERICA CHESS FEDERATION, INC. ("USCF") is a not-for-profit Illinois corporation.  This defendant has appeared in this cause, and no further service is requested at this time.

3.    Defendant BILL GOICHBERG, Individually and in his Representative Capacity as a Member of the Executive Board of the USCF is an individual and resident of the State of New York.  This defendant has appeared in this cause, and no further service is requested at this time.

4.    Defendant JIM BERRY, Individually and in his Representative Capacity as a Member of the Executive Board of the USCF  is an individual and resident of the State of Oklahoma. This defendant has appeared in this cause, and no further service is requested at this time.

5.    Defendant RANDY BAUER, Individually and in his Representative Capacity as a Member of the  Executive Board of the USCF, is an individual and resident of the State of Iowa.  This defendant has appeared in this cause, and no further service is requested at this time.

6.    Defendant RANDALL HOUGH, Individually and in his Representative Capacity as a Member

of the Executive Board of the USCF, is an individual and resident of the State of California. This defendant has appeared in this cause, and no further service is requested at this time.

7.      Defendant BILL HALL, Individually and in his Representative Capacity as Executive Director of the USCF, is an individual and resident of the State of Tennessee. This defendant has appeared in this cause, and no further service is requested at this time.

8.      Defendant BRIAN MOTTERSHEAD is an individual and resident of the State of Massachusetts. This defendant has been served, and no further service is requested at this time.

9.      Defendant HAL BOGNER is an individual and resident of the State of California. This defendant has been served, and no further service is requested at this time.

10.     Defendant CHESS MAGNET, L.L.C. is an unofficial entity not formed under the laws of any state. This defendant has been served, and no further service is requested at this time.

11.     Defendant CONTINENTAL CHESS INCORPORATED is a corporation organized under the laws of the State of New York. This defendant has appeared in this cause, and no further service is requested at this time.

12.     Defendant JEROME HANKEN is an individual and resident of the State of California. This defendant has appeared in this cause, and no further service is requested at this time.

13.     Defendant BRIAN LAFFERTY is an individual and resident of the State of Massachusetts. This defendant has been served, and no further service is requested at this time..

14.     Defendant SAM SLOAN is an individual and resident of the State of New York. This defendant has appeared in this cause, and no further service is requested at this time.

15.     Defendant KARL KRONENBERGER is an individual and resident of the State of California. This defendant has appeared in this cause, and no further service is requested at this time.

_____

16.    Defendant KRONENBERGER BURGOYNE, L.L.P. is a limited liability partnership organized under the laws of the State of California.  This defendant has appeared in this cause, and no further service is requested at this time.

## II.
## JURISDICTION AND VENUE

17.    Multiple acts or omissions of Defendants, acting jointly and individually and in their individual and representative capacities, hereinafter complained of by Plaintiff occurred within the State of Texas or occurred outside of the State of Texas but the full force and effects of the acts and omissions of Defendants were felt within the State of Texas.

18.    Venue is proper in the Northern District of Texas, pursuant to 28 U.S.C. § 1391.

## III.
## STATEMENT OF FACTS

19.    Plaintiff would show that for the last thirty-five years, Susan Polgar has crossed gender and national origin barriers on the international level by becoming one of the most successful and widely known chess players in the world. Polgar has won ten Olympic medals and four Women's World Championships, and after fifty-six games over a span of four Olympiads, she has never lost.  Susan became the first female to qualify for the "Men's" World Chess Championship, thereby forcing the world chess federation to drop the word "men" from World Chess Championship. She is the only World Champion, male or female, to win the triple crown in chess (Women's World Classical, Rapid, and Blitz Championships).

20.    At the age of twenty-one, Susan Polgar was the first woman to earn the men's Grandmaster title by fulfilling all of the traditional Grandmaster requirements.  She first became ranked number one in the world at the age of fifteen and has remained ranked in the top three in the world for over the

last twenty-four years.  Born in Hungary, Polgar's career began at the age of four when she won the Budapest Championship for Girls Under 11 with the perfect score of 10-0.   In 2003, the USCF honored her with the Grandmaster of the Year award, making her the first female to receive that honor. In 2004, Polgar emerged from her nearly nine-year retirement to lead the United States Women's National Team to win the silver medal at the 2004 Olympiad in Calvia, Spain, the first ever medal in history for the United States Women's Team.  She herself won the unprecedented amount of four medals at that Olympiad, two gold and two silver, including the Best Overall Performance of the entire Women's Olympiad.

21.     Through all her success, Susan Polgar has dedicated herself, by substantial donations of her time and money, to the promotion of the vast benefits of chess among youth and especially young women. She is founder of the Susan Polgar Foundation, a nonprofit organization to promote chess throughout the U.S. for youth of all ages, especially young women.  She is sponsor and organizer of the prestigious annual Susan Polgar National Invitational for Girls Championship, Susan Polgar World Open Chess Championship for Girls, Susan Polgar World Chess Challenge for Boys, Susan Polgar National Open Chess Championship for Girls, Susan Polgar National Chess Challenge for Boys, the NY City Mayor's Cup and SPICE Cup.  She has written chess books published in several different languages and thirteen instructional chess DVDs.  Polgar has been featured in a worldwide documentary produced by National Geographic called "My Brilliant Brain." Discussions are also underway to feature Susan Polgar in other films and endorsement contracts.

22.     In May 2007, Texas Tech University announced it had established the Susan Polgar Institute for Chess Excellence (SPICE) and  hired Polgar as its executive director and head coach of the Texas Tech Knight Raiders chess team.  Polgar and her family permanently relocated to Lubbock, Texas

in August 2007.  Texas Tech created SPICE with the ideas of building one of the world's premier centers for chess education, research and outreach and of solidifying Texas Tech as a national chess contender.  In merely one year of its existence, SPICE has experienced growth in chess scholarships at Texas Tech University and hosted the Second Annual SPICE CUP International Invitational Grandmaster Tournament in September 2008, which was the highest rated 10-player international round-robin in United States history given the caliber of the Grandmasters appearing.  Texas Tech University, through the reputation and name recognition of Susan Polgar, is quickly becoming recognized as the epicenter for competitive and educational chess play and studies.

23.    Despite all her successes, there are others who strive for nothing more than to ruin Polgar's career and business relationships and to see her fail.  For the past thirty-five years, Polgar has been a chess superstar and one of the most popular chess figures in history.  Because she is a woman and of foreign descent, all Defendants herein have long harbored ill will and jealousy towards Polgar, her husband, and more recently, the SPICE program.  Defendants herein have apparently become alarmed and irrationally concerned with Polgar's success and her championing of chess among all people, especially young women.

24.    The USCF and other Defendants herein have become increasingly antagonistic and vocal in their jealous attacks fomented by Polgar's fame, notoriety and widespread fan appeal. In August 2007, Susan Polgar was overwhelmingly elected to the Executive Board of the USCF and became the first chairman of the USCF.  However, despite this nationwide showing of support by USCF members, certain members of the Executive Board and others within the USCF have become embittered and have conspired to unlawfully use the internet and international media outlets to slander, defame, and disparage Polgar personally, to damage her business relationships and to inflict

emotional distress upon this very popular, generous and gifted person.

25.    Defendant Goichberg's ill will towards Polgar began in 2004 when he, as the Executive Director of the USCF, cancelled the U.S. Women's Olympiad Training program operated by Polgar in 2003 which lead to the first ever winning of Women's Olympiad medals by a United States team. In spite of the unprecedented success of theWomen's Olympiad Team, the USCF refused to publish the picture of the team on the cover of Chess Life, the official magazine of the USCF. In addition, Goichberg refused to pay the bonuses to the players as stated in the signed agreements between the players and the USCF. After a long and painful negotiation, the USCF agreed to pay all team members except Polgar, who was the team leader.

26.    Defendant Goichberg's ill will towards Polgar resurfaced in December 2006 when Polgar and Truong announced their candidacies for positions on the USCF Executive Board.  For the past three decades, Defendant Goichberg has been a constant figure in the USCF, as an employee, board member, executive director, and chess politician.  As the sole owner of the biggest chess tournament organizing company in the United States, Defendant Continental Chess Association, where millions of dollars have been collected in entry fees and paid out as prizes, Goichberg creates a direct conflict of interest for himself by owning the very successful for-profit Continental Chess and by also serving as President of the non-profit USCF.  Many USCF decisions made as a result of Goichberg's political influence directly benefitted Goichberg via Continental Chess financially. For the last thirty years, Goichberg has only supported Executive Board candidates and staff members at the USCF headquarters whom he knew would support his political agenda and earning power for Continental Chess.

27.    For example, one tournament organizer recently made an excellent bid to the USCF to host

various national championships in Chicago. One of Goichberg's most profitable chess tournaments also takes place in Chicago at a similar time. The motion to award a multiple year bid to the Chicago organizer would have passed 3 (Yes) - 2 (No) -1 (Abstention) if Goichberg had recused himself from voting due to his conflict of interest with Continental Chess. Goichberg refused to recuse himself, and his Board majority refused to ask him (Goichberg) to recuse himself, and the motion was at a 3-3 deadlock when the Board voted. The USCF sees annual cash inflows in the range of $3.2 million through the dues of its 80,000 members, grants, gifts, advertisements, bequests, sponsorships, et cetera. At one time, the USCF annual revenues exceeded $6 million. For the last thirty years, Goichberg, through his constant presence on the USCF Executive Board, has managed to unlawfully cause many thousands of dollars to be unfairly directed to his pocket, his political allies, and the coffers of Continental Chess.

28.     In the past, if a person announcing his or her candidacy for the Executive Board seemed poised to end Goichberg's position of comfort with the USCF, Goichberg, along with Defendants Hanken, Hough, Bogner, Sloan, Mottershead and Lafferty would engage in a pattern of slandering and defaming that candidate and cause them to lose the Executive Board election. Defendants Goichberg, Hanken and Hough used these tactics and succeeded when Grandmaster Larry Evans ran for election to the Executive Board in 1992.

29.     Defendants Goichberg, Hanken, Hough, Bogner, Sloan, Mottershead and Lafferty engaged in these tactics in December 2006 when Polgar and Truong announced their candidacies for the USCF Executive Board. Polgar and Truong pledged to clean up the destructive chess politics, end corruption, and turn the USCF into a viable organization. Predictably, Defendant Goichberg opposed the candidacies of Polgar and Truong. Goichberg posted negative things about them on his website.

Before the election, Goichberg mailed over 17,000 post cards to USCF voters asking them not to vote for Polgar and Truong and smeared their personal and professional reputations. Goichberg supporters such as Defendants Hanken, Bogner, Mottershead, Sloan and Lafferty defamed and libeled Polgar and Truong constantly throughout and after the election.

30.      Despite Goichberg's efforts, Polgar's margin of victory was the biggest in USCF history. She came in first in 47 of 50 states.  Polgar and Truong began their Executive Board tenure in August 2007. After election results, USCF by-laws provide that all seven(7) new board members shall meet to discuss, deliberate, and then vote among themselves for the positions of President, Vice-President, Vice-President of Finance, and Secretary.   When Polgar and Truong arrived in Cherry Hill, NJ in August 2007, for the first post-election board meeting, Defendant Berry and others informed Polgar and Truong that a deal was made in advance to elect Defendant Goichberg as President of the USCF despite the clear mandate by the voters.  To keep peace and harmony among the Board for the sake of the USCF, Polgar and Truong maintained silence and voted 7-0 with the Board to make Goichberg President.

31.      Members of the Executive Board and others in conspiracy with them heightened their attacks on Polgar and Truong even further, when, in September 2007, a regular member of the USCF, Gregory Alexander, complained in writing to the Executive Board and to the Executive Director, Defendant Bill Hall, that Defendant Mottershead illegally accessed Alexander's personal account on the USCF Forums. Defendants Bogner and Chess Magnet herein were paid contractors of the USCF, and in September 2007 were engaged in the job of rebuilding the USCF website.  Defendants Bogner and Chess Magnet supervised Defendant Mottershead as a subcontractor to create the USCF Forums as part of the new USCF website.  To complete this task, Mottershead was made an administrator

of the USCF website, and with this status had the ability to retrieve passwords for each USCF member's personal account on the USCF Forums. Mottershead accessed Alexander's personal account despite having signed a Non-Disclosure Agreement before Mottershead began work on the USCF website.

32.    When Alexander sent his written complaint to the Executive Board and Executive Director, the only Executive Board members to speak up and oppose Mottershead's conduct were Polgar and Truong. Polgar and Truong sent communications to the other Board members and to the Executive Director calling for Mottershead's termination and removal of his access to the USCF website. In retaliation of Polgar and Truong's suggestions, Defendants Bogner, Chess Magnet and Mottershead pretextually announced Truong was the Fake Sam Sloan and began an investigation to prove their claim. Defendants Bogner and Mottershead repeatedly and publicly stated that Defendants Goichberg and Hall approved and fully backed their investigation.     Defendant Goichberg exploited this opportunity to cause Polgar and Truong to be removed from the USCF Executive Board.

33.    For years prior, one USCF member, Sam Sloan, has complained to anyone who would listen that unknown individuals impersonate him (Sloan) on the internet and make thousands of derogatory internet postings in his name (the Fake Sam Sloan "FSS" postings). It is widely believed that Sloan himself is the Fake Sam Sloan and makes the postings to draw attention to himself. After August 2007, Sloan claimed the FSS postings caused him to lose to Polgar in the 2007 election to the Executive Board.

34.    Although quick to investigate the FSS postings, no investigation was ever made of all the libelous and defamatory posts made about Polgar and Truong by Goichberg's supporters and political allies. In fact, Defendants Goichberg, Hall, and other board members refused to investigate a

_____

disgusting chess blog at www.chesswhore.blogspot.com created in 2006 to libel and defame Polgar. The blog is still online today, and the USCF refuses to take a single action to protect a minority Board member. Members of the USCF Executive Board and the USCF Executive Director also chose not to investigate countless racist, sexist, and sexually inappropriate posts toward Polgar and Truong, especially Polgar, occurring in the recent weeks, months and even years. Instead, the USCF, Goichberg, Hall, Hough, Bauer and Berry chose to investigate claims by Defendant Sam Sloan, a convicted felon with a long history of unethical conduct and inappropriate sexual behavior, and serial litigant who has sued the USCF multiple times.

35.    Within weeks of Bogner and Mottershead beginning their investigation, in October 2007, Mottershead produced what is known as the "Mottershead Report," a document which, through unreliable and unproven methodologies, claims to prove that Truong is the Fake Sam Sloan. In essence, the Mottershead Report unlawfully levels false and defamatory accusations against Polgar and Truong. Mottershead unlawfully gave his report to Defendant Lafferty and also unlawfully released it to the general public. Mottershead also posted this report on his own website.

36.    Defendant Lafferty unlawfully caused the Mottershead Report to be delivered to Dylan Loeb McClain, a reporter for the NY Times who published in the NY Times the results of the Mottershead Report and many other negative articles about Polgar and Truong. Millions of people worldwide, including residents of Lubbock and officials at Texas Tech University read the NY Times. Defendants Bogner, Mottershead, Goichberg, Hall and Lafferty also unlawfully passed the Mottershead Report to Sam Sloan, who used the report as a basis to sue the USCF in New York for the FSS postings. Defendant Bogner contacted Marlena Hartz, a reporter for the Lubbock Avalanche Journal, and Defendant Lafferty contacted Adam Young, a reporter for the Texas Tech University Daily Toreador

with the intent and purpose of causing yet another publication of the defamatory Mottershead Report. Both Hartz and Young published articles in their respective periodicals detailing the Sam Sloan lawsuit and the Mottershead Report results, all of which caused serious harm to the reputations and images of Polgar and Truong in Lubbock, Texas and at Texas Tech University.

37.     After release of the Mottershead Report, the USCF and its Executive Board members, Defendants, Hall, Hough, Bauer, Goichberg and Berry, shopped the false and defamatory Mottershead Report to various internet fraud investigation firms who could help them build their case against Truong. The first firm presented with the Mottershead Report declined to help stating such a claim that Truong was the FSS would be impossible to prove. The second firm presented with the Mottershead Report stated that the Report contained discrepancies after preliminary review.[1] The third firm the USCF presented with the Mottershead Report were Defendants Karl Kronenberger and Kronenberger Burgoyne, who agreed to accept the case. When the USCF, and its full Executive Board, including Polgar and Truong, hired Karl Kronenberger and his firm, it was with the understanding that Kronenberger represented the entire USCF Executive Board, including Polgar and Truong, and that his function would be to help the USCF determine the real identity(ies) of the Fake Sam Sloan.

38.     When Sloan sued the USCF in New York in October 2007, the USCF carried a policy of insurance with Chubb which paid for a defense of the New York lawsuit for the USCF and its Executive Board members, Polgar and Truong included. In or around November 2007, Defendant Kronenberger conspired with the USCF and Defendants Hall, Hough, Bauer, Goichberg and Berry

---

[1]Despite Susan Polgar's multiple requests in writing, Defendants Goichberg and Hall repeatedly refused to allow Polgar and her experts the opportunity to examine the validity of the Mottershead Report and any supporting evidence.

to contact Chubb and persuade it (Chubb) to refuse to extend coverage to Polgar and Truong, which would force Polgar and Truong to defend the lawsuit with their own funds and create for them serious financial hardship. Defendant Kronenberger suggested this idea and the Board voted 5-0 to authorize defendant Kronenberger to contact Chubb insurance. The Board refused Polgar and Truong the opportunity to participate in the vote per the suggestion of Defendant Kronenberger.

39.    In 2008, every Defendant named herein remained consumed and absorbed by the task of seeing Polgar and Truong removed from their Executive Board positions with the USCF.  In June 2008, in conspiracy with Defendants USCF, Hall, Hough, Bauer, Goichberg and Berry, Defendants Kronenberger and Kronenberger Burgoyne unlawfully filed a "doe" lawsuit in California Superior Court.  This lawsuit failed to identify any defendants by name and instead, sought an order from the court allowing Kronenberger and the USCF to conduct *ex parte* discovery which could lead to defendants they could name in the suit.

40.    With his real targets in sight (Polgar and Truong), armed with an *ex parte* discovery order, and without any named defendants present to oppose his actions, Kronenberger and Kronenberger Burgoyne, in conspiracy with the USCF, Hall, Hough, Bauer, Goichberg and Berry, unlawfully issued no less than twenty, third-party subpoenas to gain information specifically on Polgar and Truong in support of the FSS witch hunt.  Kronenberger and Kronenberger Burgoyne served one of the subpoenas on American Express seeking information about a specific cardholder account they believed belonged to Paul Truong.  In addition, Kronenberger also sought information directly from Truong to prove that he was not the FSS.  With the understanding that Kronenberger acted as Truong's attorney in Truong's capacity as an Executive Board member, Truong gave Kronenberger, in confidence, a copy of his Texas Tech paystub for the pay period ending July 31, 2007, a copy of

_____

Truong's one-way airline ticket to Lubbock on Southwest Airlines, and a credit card statement showing charges made in Lubbock, to show that he (Truong) was in Texas at a time when Kronenberger thought FSS postings were being made from an Internet Protocol address in New York.

41.     In August 2008, the USCF held its annual Delegates' Meeting in Dallas, Texas. The purpose of the annual Delegates' Meeting is to review the status of the USCF and its past and future undertakings and to vote on any motions brought before the Delegates that require a Delegates' vote under the USCF by-laws. Unbeknownst to Polgar and Truong, Defendants Goichberg, Hall, Hough, Bauer, Berry, Kronenberger and Kronenberger Burgoyne arranged for Defendant Kronenberger to fly to Dallas and give a "presentation" at the Delegates' Meeting proving that Truong was the Fake Sam Sloan. Kronenberger presented information gained by the third-party subpoenas he issued in the California action, and after forty-five minutes of conclusory statements and a summary of the Mottershead Report conclusions, Kronenberger claimed that Paul Truong was the Fake Sam Sloan and encouraged the USCF Delegates to vote to remove Truong from the Executive Board. During his presentation, Kronenberger displayed the paystub Truong had given him in confidence for over 100 Delegates to see. Four motions to remove Truong from the Board were presented that day, and all four motions failed. Two motions received less than 30% of the 67% vote needed. One motion was withdrawn, and another was ruled moot.

42.     Defendants Hanken, Hough and Goichberg wanted so badly to see Truong removed from the Board that they even went as far as bribing a USCF member, Jessica Lauser, and her husband, Hero Smith,  with free hotel accommodations, airline tickets, tournament entry fees, meals and future writing opportunities in exchange for them to come to Dallas for the Delegates Meeting and vote to

_____

remove Truong.  Lauser was never a Delegate, and Smith was not even a member of the USCF until days before the USCF Delegates' Meeting, when Hanken, Hough and Goichberg paid Smith's membership fees.  Hough and Goichberg then certified both Lauser and Smith as Delegates so they could vote against Truong in the motions to remove Truong from the Executive Board. After the "USCF trial" against Truong, Lauser and Smith voted against removing Truong from the Executive Board. Despite attending the meeting with the purpose of voting for Truong's removal, they changed their votes after hearing facts Truong presented in his defense and which facts were suppressed by Defendants Kronenberger, Goichberg, Hall, Hough, Hanken, and Berry.

43.     After the 2008 Delegates' Meeting and the four motions to remove Truong from the USCF Executive Board failed, Defendant Lafferty remained so intent on harassing Truong that he asked Defendant Kronenberger for a copy of Truong's Texas Tech paystub that Kronenberger displayed at the Delegates' Meeting.  With a copy of the paystub, Lafferty sent correspondence to United States Bankruptcy Judge Dennis Milton and District Attorney Richard A. Brown in New York claiming Truong committed a fraud with his bankruptcy petition.  Bankruptcy Trustee Geltzer responded to Lafferty's correspondence and stated that he (Geltzer) felt that it is not appropriate for to reopen the case, but Lafferty pursued the issue further with other state and federal agencies. As a result of Lafferty's actions, an investigation of Truong is currently underway by certain state and federal authorities.

44.     In the last several months, Defendant Lafferty has continued to slander and defame Polgar and Truong, and has admitted several of his acts of malfeasance on the internet.  A sample of his internet postings include:

        a.      On January 31, 2009, at 9:29 p.m., Lafferty posted on the USCF Forums:

_____

**"I brought the Mottershead report to the attention of the US Attorney in Boston who had the report reviewed by their forensic expert. While they declined to prosecute in Boston, the US Attorney did not conclude that the complaint was without validity (implicitly taking the position the Mottershead's report is accurate). The US Attorney in Boston suggested that I take the complaint to the US Attorney in Tennessee or Illinois. To be absolutely clear, I asked Mr. Mottershead for a copy of the report for the specific, and sole purpose of providing it to Federal law enforcement. That is what I did."**

b.    On February 21, 2009, at 12:33 a.m., Lafferty posted on Newsgroups: rec.games.chess.politics, rec.games.chess.misc:

**"Anyone seen Paul Pufferfish lately? Where's he hiding?"**

c.    On February 25, 2009, at 18:28, Lafferty posted on Newsgroups: rec.games.chess.politics, rec.games.chess.misc:

**"When process was served on Polgar in Arizona, Paul Truong was seen running out of the room, leaving his wife behind to be served with process in the USCF's Illinois action. What a man! Now he's on the run being shielded by those who know him claiming he's out of town and won't be back for a long time. Is he in the US? Argentina playing soccer? In Boca sipping Cuba Libres? On his way to Elistia to knock back vodka shots with his buddy Kirsan's staff man? It was reported that earlier this week he was hiding under his desk at TTU. Did he leave there under cover of a skirt? Stay tuned. More travel adventures with Paul and friends coming up on this channel soon."**

d.    On March 11, 2009, at 2:06 p.m., Lafferty posted on the USCF Forums:

**"TTU isn't going to help Truong falsify his TTU start date. I'll bet that when the USCF subpoenas his payroll records, TTU will probably cut Truong loose to swing in the West Texas wind. Of course, the US Attorney attached to the EDNY Bankruptcy Trustee's Office may already have subpoenaed those records."**

e.    On March 12, 2009, at 5:29 a.m., Lafferty posted on the USCF Forums:

**"I received an update this morning from the Queens Co. District Attorney's Office confirming once again that the Truong fraud bankruptcy allegation matter has been referred to and is still with the US Attorney in the EDNY."**

f.    On March 12, 2009, at 1:57 p.m., Lafferty posted on the USCF Forums:

**"I've posted here before that the copy of the Truong paystub that I have is the same**

**one exhibited to delegates in open meeting last August in Dallas.  I asked Mr. Kronenberger for a copy which I then provided to the bankruptcy court."**

45.     Each of the above named defendants, individually and as directors acting in furtherance of the improper and unlawful objections of the USCF, has  published or has caused to be published on the internet and in national and international media outlets, including the Lubbock Avalanche Journal, the Texas Tech Daily Toreador and the New York Times, slanderous, defamatory and untrue statements about Polgar and Truong intended to destroy Polgar's career.  Defendant Lafferty has made phone calls to Polgar's ex-husband to find things out about Polgar that Lafferty may use against her. Lafferty has made negative telephone calls and contacts to the offices of the President, Chancellors and Provosts of Texas Tech University in publication of false, defamatory information in an effort to destroy and cease Polgar's participation in the SPICE program and perhaps the very existence of the SPICE program itself.

46.     Defendant Lafferty also spread a rumor to third parties about a false allegation from Polgar's ex-husband that Polgar and Truong were child abusers. Defendants Lafferty and Sloan have both also contacted Marlena Hartz and Adam Young, local media reporters in Lubbock, Texas, to cause to be published negative, defamatory and false media reports about Plaintiff and her husband. Both Sloan and Lafferty have posted libelous, defamatory and negative items about Polgar and Truong on their own chess websites and chess blogs. Each of the above-named defendants has conspired to plan and orchestrate their unlawful attacks upon Susan Polgar.

47.     Since 2007, Defendants Hall, Goichberg, Hough, Berry, and Bauer committed various acts to harm Polgar's image and career in spite of the fact that she is the highest rated female player in the United States and is currently ranked in the top three in the world. She was passed over during the players' selection process to represent the United States in the first ever World Mind Sports Games

in October 2008 in Beijing, China despite being higher rated than all other women and most men representing the United States. Defendants herein have caused great harm to and have impeded Polgar's effort to promote and popularize chess. They have unlawfully undermined her effort to award hundreds of thousands of dollars in chess scholarships and prizes to young people across the United States by unfairly targeting her major events and by refusing to give proper coverage and advertisement in Chess Life, Chess Life Online and other USCF publications.

48.    After sponsoring and organizing the Susan Polgar National Open for Girls and Susan Polgar National Chess Challenge for Boys for three years and awarding approximately $500,000 in chess scholarships and chess prizes to young people from across the United States, the USCF and Defendant Bill Hall have refused to allow Polgar to advertise these same events for 2009. As a result of Defendants' concerted efforts, Polgar's chess events have suffered greatly.

## IV.
## BASIS OF THIS COURT'S EXERCISE OF PERSONAL JURISDICTION OVER DEFENDANT LAFFERTY

49.    Defendant Lafferty has committed several unlawful acts outside the State of Texas but with the specific intent and aim for their harm and effects to be felt directly by persons residing in Texas. Defamatory publications by Lafferty have caused subsequent, negative newspaper articles to appear in the pages of newspapers in and read by local residents of the community in Lubbock, Texas.

50.    In addition, Lafferty has made multiple defamatory internet postings published in Texas which have had a direct impact on two residents of Lubbock, Texas, which fulfill the requirements of the following case law to subject Lafferty to personal jurisdiction in Texas: *Calder v. Jones*, 465 U.S. 783 (1984); *Mink v. AAAA Dev. LLC*, 190 F.3d 333 (5th Cir. 1999); *Amway v. The Procter & Gamble Co.*, 346 F.3d 180, (W.D. Mich. 2000); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir.

_____

1998)*; Zippo Mfg. Co. v. Zippo Dot Com. Inc.*, 952 F.Supp.1119 (W.D.Pa. 1997).

51.     Finally, Lafferty has engaged in a conspiracy to harm Plaintiff with persons already subject to this Court's exercise of personal jurisdiction over them, i.e. Defendants USCF, Sloan, Kronenberger, Kronenberger Burgoyne, Hall, Hough, Bauer, Goichberg, Berry, and Hanken, and Lafferty should therefore be subject to this Court's jurisdiction as well.

**V.**
**BASIS OF THIS COURT'S EXERCISE OF PERSONAL JURISDICTION OVER DEFENDANT MOTTERSHEAD**

52.     Defendant Mottershead has committed several unlawful acts, specifically his authoring of the defamatory Mottershead Report, outside the State of Texas but with the specific intent and aim for their publication in and damage to persons residing in Texas.  Unlawful actions by Mottershead have caused the publication of untrue and defamatory newspaper articles to appear in the pages of newspapers in and read by local residents of the community in Lubbock, Texas.

53.     In addition, Mottershead has made multiple defamatory internet postings which have been published in and damaged two residents of Lubbock, Texas, which fulfill the requirements of the following case law to subject Mottershead to personal jurisdiction in Texas: *Calder v. Jones*, 465 U.S. 783 (1984); *Mink v. AAAA Dev. LLC*, 190 F.3d 333 (5th Cir. 1999); *Amway v. The Procter & Gamble Co.*, 346 F.3d 180, (W.D. Mich. 2000); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998)*; Zippo Mfg. Co. v. Zippo Dot Com. Inc.*, 952 F.Supp.1119 (W.D.Pa. 1997).

54.     Finally, Mottershead has engaged in a conspiracy to harm Plaintiff with persons already subject to this Court's exercise of personal jurisdiction over them, i.e. Defendants USCF, Sloan, Kronenberger, Kronenberger Burgoyne, Hall, Hough, Bauer, Goichberg, Berry, and Hanken, and Mottershead should therefore be subject to this Court's jurisdiction as well.

## VI.
## BASIS OF THIS COURT'S EXERCISE OF PERSONAL JURISDICTION OVER DEFENDANTS BOGNER AND CHESS MAGNET

55.     Defendant Bogner, individually and acting on behalf of Defendant Chess Magnet, and Defendant Chess Magnet have committed several unlawful acts outside the State of Texas but with the specific intent and aim for their harm and effects to be felt directly by persons residing in Texas. Unlawful, defamatory publications by Bogner, individually and on behalf of Chess Magnet, have caused subsequent, negative newspaper articles to appear in the pages of newspapers in and read by local residents of the community in Lubbock, Texas.

56.     In addition, Bogner has made multiple defamatory internet postings which have had a direct impact on two residents of Lubbock, Texas, which fulfills the requirements of the following case law to subject Bogner and Chess Magnet to personal jurisdiction in Texas: *Calder v. Jones*, 465 U.S. 783 (1984); *Mink v. AAAA Dev. LLC*, 190 F.3d 333 (5th Cir. 1999); *Amway v. The Procter & Gamble Co.*, 346 F.3d 180, (W.D. Mich. 2000); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998)*; Zippo Mfg. Co. v. Zippo Dot Com. Inc.*, 952 F.Supp.1119 (W.D.Pa. 1997).

57.     Furthermore, in late 2007, Bogner traveled to a chess tournament in Houston, Texas, on behalf of Defendant Chess Magnet for the purpose of promoting the business of Chess Magnet. While in Houston, Bogner made oral slanderous and defamatory remarks about Susan Polgar to a third party, Dan DeLeon.  Bogner and Chess Magnet are subject to personal jurisdiction in Texas if the cause of action arises from the slanderous remarks Bogner said in Houston, and Plaintiff makes claim for the same herein.

58.     Finally, Bogner and Chess Magnet have engaged in a conspiracy to harm Plaintiff with persons already subject to this Court's exercise of personal jurisdiction over them, i.e. Defendants USCF,

Sloan, Kronenberger, Kronenberger Burgoyne, Hall, Hough, Bauer, Goichberg, Berry, and Hanken. Bogner and Chess Magnet should therefore be subject to this Court's jurisdiction as well.

## VII.
## SLANDER, LIBEL, DEFAMATION, AND SLANDER PER SE

59.    Each of the above sections I through VI are incorporated herein as if recited verbatim.

60.    Plaintiff would show that the unlawful acts and omissions of Defendants constitute slander, libel, defamation, and slander per se as these terms are known under Texas law.  As a direct, proximate and producing result thereof, Plaintiff has sustained damages well in excess of the minimal jurisdictional limits of this Court.

## VIII.
## BUSINESS DISPARAGEMENT

61.    Each of the above sections I through VII are incorporated herein as if recited verbatim.

62.    Plaintiff would show that the above mentioned unlawful acts and omissions of Defendants constitute business disparagement as that term is known under Texas law, and as a direct, proximate and producing result thereof, Plaintiff has sustained damages well in excess of the minimum jurisdictional limits of this Court.

## IX.
## TORTIOUS INTERFERENCE WITH CONTRACTS AND BUSINESS RELATIONSHIPS

63.    Each of the above sections I through VIII are incorporated herein as if recited verbatim.

64.    Plaintiff would show that the unlawful acts and omissions of Defendants constitute tortious interference with contracts and business relationships as these terms are known under Texas law.  As a direct, proximate and producing result thereof, Plaintiff has sustained damages well in excess of the minimum jurisdictional limits of this Court.

# X.
# CIVIL CONSPIRACY

65.    Each of the above sections I through IX are incorporated herein as if recited verbatim.

66.    Defendants met with a specific objective to be accomplished, arrived at a meeting of minds on the objective and subsequent courses of action, engaged in multiple unlawful and overt acts to accomplish their unlawful objectives, all of which were the direct, proximate and producing cause of the damages suffered by Plaintiff.    Defendants conspired with the specific intent to agree to accomplish the unlawful purpose and to accomplish the lawful purpose by unlawful means. Plaintiff would show that as a direct, proximate and producing result of Defendants' civil conspiracy and unlawful conduct, Plaintiff has sustained damages well in excess of the minimal jurisdictional limits of this Court.

# XI.
# BREACH OF FIDUCIARY DUTY /LEGAL MALPRACTICE

67.    Each of the above sections I through X are incorporated herein as if recited verbatim.

68.    At all times pertinent hereto, Defendant Kronenberger and Defendant Kronenberger Burgoyne, L.L.P. were acting as attorneys for the USCF Executive Board, including Polgar as a member of the Executive Board of the USCF.    Pursuant to that attorney-client relationship, Kronenberger and Kronenberger Burgoyne, L.L.P. owed Polgar a duty of loyalty and many other fiduciary duties.    Kronenberger and Kronenberger Burgoyne, L.L.P. breached those duties by engaging in a course of conduct calculated to damage Polgar individually, as a member of the Executive Board, and in her business relationships.    Among other things, these two Defendants engaged in conduct designed to strip Polgar of insurance benefits and a defense in litigation in which she has become involved as a member of the Executive Board of the USCF as well as related

_____

litigation. Further, Defendants Kronenberger and Kronenberger Burgoyne, L.L.P. have secretly acted as conspirators with and enablers to the other Defendants herein in causing the unlawful attacks upon Susan Polgar as described above. Defendants Kronenberger and Kronenberger Burgoyne, L.L.P. fell far below the standard of care an attorney owes his client, and as a direct, proximate and producing result of their acts, Plaintiff has sustained damages well in excess of the minimal jurisdictional limits of this Court.

## XII.
## ABUSE OF PROCESS

69.     Each of the above sections I through XI are incorporated herein as if recited verbatim.

70.     Defendants have unlawfully filed or caused to be unlawfully filed lawsuits against Plaintiff, including the "doe" action in California. Defendants have communicated multiple times to Plaintiff and her husband that the lawsuits and defamatory internet postings will cease if Plaintiff and her husband will resign from the Executive Board of the USCF and pledge to never run for a position again. At the time Defendants instituted the lawsuits and posted defamatory comments on the internet, and at the time Defendants demanded Plaintiff and her husband resign from the Executive Board, Defendants well knew that the lawsuits were falsely brought, and Defendants sued Plaintiff for the purpose of coercing Plaintiff into resigning from the Executive Board.

## XIII.
## MALICIOUS PROSECUTION

71.     Each of the above sections I through XII are incorporated herein as if recited verbatim.

72.     Defendants USCF, Goichberg, Berry, Hall, Hough, Bauer, Kronenberger, and Kronenberger Burgoyne have caused to be filed against Plaintiff, after the filing of this action, two other lawsuits, one pending in California and the other pending in Illinois, which arise from the same nucleus of facts

forming the basis for the present action.  These Defendants have interfered with the person and property of Plaintiff and of her husband and with a complete lack of probable cause for so doing. These Defendants did  not and do not intend to prosecute the California proceeding to judgment but only intended to injure Plaintiff.  These Defendants did not honestly and reasonably believe there were grounds for action but nevertheless proceeded with conscious indifference.

## XIV.
## INDEMNIFICATION

73.    Each of the above sections I through XIII are incorporated herein as if recited verbatim.

74.    Defendants USCF, Goichberg, Berry, Hall, Hough, Bauer, Kronenberger, and Kronenberger Burgoyne have caused to be filed against Plaintiff, after the filing of this action, two other lawsuits, one pending in California and the other pending in Illinois, which arise from the same nucleus of facts forming the basis for the present action.  Defendants filed those lawsuits without following the procedure required by the USCF By-Laws.  Plaintiff hereby makes demand for indemnification for the defense of the California and Illinois lawsuits as provided by the USCF By-Laws.

## XV.
## ATTORNEYS' FEES

75.    Each of the above sections I through XIV are incorporated herein as if recited verbatim.

76.    Plaintiff herein has retained James L. Killion of Killion Law Firm to do all things necessary to recover all amounts due and owing to her by Defendants herein.  Plaintiff prays for the recovery of reasonable and necessary attorneys' fees incurred in this behalf.

## XVI.
## EXEMPLARY DAMAGES

77.    Each of the above sections I through XV are incorporated herein as if recited verbatim.

78.    Plaintiff would further show the Court that at all times pertinent hereto Defendants have acted

willfully, maliciously, and with a specific intent to harm Plaintiff.  Plaintiff would show that these

unlawful acts of Defendants are of such a nature as to justify the imposition of exemplary or punitive

damages herein.

**XVII.**
**INJUNCTIVE RELIEF**

79.      Each of the above sections I through XVI are incorporated herein as if recited verbatim.

80.      Plaintiff  would  further  show  that  a  large  body  of  evidence  exists  which  demonstrates

conspiracy between Defendants to defame and unlawfully damage Polgar in her personal and business

endeavors. If this evidence is damaged, destroyed, or placed beyond the reach of Plaintiff, she will

be irreparably damaged. Polgar therefore requests  injunctive relief to prevent Defendants from

destroying, altering, or deleting documents, evidence or record, electronic or otherwise, that relate

to any of the matters implicated by this lawsuit, that form the basis or are the subject of this lawsuit,

or pertaining to Plaintiff, including but not limited to all hard drives, backups, archives, and other

possible sources of stored metadata or information, including but not limited to the following: (a) the

Confidential Binfo Email archive used by the Executive Board of USCF, (b) all master and back-up

copies of the JoomlaphpBB3 Bridge log, (c) all master and back-up copies of the USCF Forums SQL

database, (d)all master and back-up copies of the USCF Forums Server Apache logs, and (e) all other

communications among Defendants, or to or from Defendants to third-parties evidencing Defendants'

defamation, libel, slander, intentional infliction of emotional distress, or conspiracy to damage

Plaintiff, disparage Plaintiff's business or to defame Plaintiff.

81.      Plaintiff has alleged a cause of action against Defendants, and as indicated in this First

Amended Complaint and in the Affidavit of Susan Polgar which is attached hereto as Exhibit "A" and

incorporated by reference, Plaintiff has shown a probable right of recovery and likelihood of success

on the merits. Plaintiff will suffer imminent, irreparable harm without Court intervention, and there is no adequate remedy at law.

82.     As a direct and proximate result of Defendants' wrongful actions as alleged in this First Amended Complaint, Plaintiff has suffered and will continue to suffer imminent injury that will be irreparable and for which no remedy at law exists without the protections of a temporary restraining order and injunctive relief. Plaintiff is willing to post the necessary reasonable bond to facilitate the injunctive relief requested.

83.     The only adequate, effective, and complete relief to Plaintiff is to restrain Defendants from further engaging in certain proscribed activities, as set forth below. Pursuant to TEX. R. CIV. P. 680 et seq., TEX. BUS. & COM. CODE§ 16.29 and TEX. CIV. PRAC. & REM. CODE §65.001 et seq., and in order to preserve the status quo during the pendency of this action, Plaintiff seeks a temporary restraining order, and upon hearing, a temporary injunction, ordering and immediately restraining the Defendants, including the Defendants' agents, servants, employees, independent contractors, attorneys, representatives, and those persons or entities in active concert or participation with them (collectively, the "Restrained Parties") as follows:

> **Enjoining the Restrained Parties from the destruction alteration or deletion of any documents, evidence or record, electronic or otherwise, that relate to any of the matters implicated by this lawsuit, that form the basis or are the subject of this lawsuit, or pertaining to Plaintiff, including but not limited to all hard drives, backups, archives, and other possible sources of stored metadata or information, including but not limited to the following: (a) the Confidential Binfo Email archive used by the Executive Board of USCF, (b) all master and back-up copies of the JoomlaphpBB3 Bridge log, (c) all master and back-up copies of the USCF Forums SQL database, (d) all master and back-up copies of the USCF Forums Server Apache logs, and (e) all other communications among Defendants, or to or from Defendants to third-parties evidencing Defendants' defamation, libel, slander, intentional infliction of emotional distress, or conspiracy to damage Plaintiff, disparage Plaintiff's business or to defame Plaintiff.**

## XVIII.
## REQUEST FOR JURY TRIAL

84.    Plaintiff requests a trial by jury of the issues in this cause.

WHEREFORE, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon final trial Plaintiff have judgment against Defendants, jointly and severally, as follows:

1.    Reimbursement and recovery of all damages in the amount of at least $10,000,000.00 sustained by Plaintiff herein;

2.    Recovery of exemplary/punitive damages from Defendants in an amount to be determined by the trier of fact herein;

3.    Reimbursement and recovery of reasonable and necessary attorneys' fees incurred and expended by Plaintiff herein;

4.    For reimbursement and recovery of pre-judgment and post-judgment interest at the highest rate provided by law;

6.    For reimbursement and recovery of all costs of court;

7.    A temporary restraining order, and upon hearing, a preliminary injunction for the relief requested above; and

8.    For reimbursement and recovery of all other damages to which Plaintiff may show herself to be justly entitled, either at law or in equity, and for all of which she will ever pray.

Respectfully submitted,

KILLION LAW FIRM

2521 74th Street

Post Office Box 64670

Lubbock, Texas 79424-4670

(806) 748-5500 Telephone

(806) 748-5505 Facsimile


/s/ Samantha Peabody Estrello

James L. Killion

SBN: 11409100

Samantha Peabody Estrello

SBN: 24056112


Attorneys for Plaintiff Susan Polgar

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of March, 2009, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the ECF system of the Court. The ECF system sent a "Notice of Electronic Filing" to the following attorneys of record, all of whom have consented in writing to accept this Notice as service of this document by electronic means.

/s/ Samantha Peabody Estrello

Samantha Peabody Estrello

Jeffrey B. Jones
Christopher B. Slayton
JONES, FLYGARE, BROWN & WHARTON, P.C.
1600 Civic Center Plaza
P.O. Box 2426
Lubbock, Texas 79408-2426
**Attorneys for USCF, Goichberg, Berry, Bauer, Hough, and Hall**

William P. Huttenbach
HIRSCH & WESTHEIMER, P.C.
Bank of America Center
700 Louisiana, 25th Floor
Houston, Texas 77002-2772
**Attorneys for Kronenberger, Kronenberger Burgoyne, Hanken, Continental Chess, Mottershead, Bogner, Chess Magnet, L.L.C., and Lafferty**

Bill LaFont
Brent Hamilton
LAFONT, TUNNELL, FORMBY, LAFONT & HAMILTON, L.L.P.
P.O. Box 1510
Plainview, Texas 79073-1510
**Local Counsel for Kronenberger, Kronenberger Burgoyne, Hanken, Continental Chess, Mottershead, Bogner, Chess Magnet, L.L.C., and Lafferty**

Samuel H. Sloan, Pro Se
1664 Davidson Ave., Apt. 1B
Bronx, New York 10453
(917) 507-7226
(917) 659-3397
samhsloan@gmail.com

# Exhibit "A"

MAR-16-2009 11:36 From:TTU SPICE          8067427040          To:8067485505          P.1/1
03/15/2009  23:38   8067485505                                          PAGE  02/02

KILLION LAW FIRM

THE STATE OF TEXAS          §

COUNTY OF LUBBOCK          §

### VERIFICATION

Before me, the undersigned Notary Public, on this day personally appeared ZSUZSANNA "SUSAN" POLGAR, who, after being duly sworn, stated under oath that she is the plaintiff in this action; that she has read section XVII in the preceding complaint; and that the statements contained therein are within her personal knowledge and to the best of her knowledge, are true and correct.

_____
Zsuzsanna "Susan" Polgar

SUBSCRIBED AND SWORN TO BEFORE ME on ___16th___ day of March, 2009.

MARY HELEN VALDEZ
MY COMMISSION EXPIRES
February 23, 2010

_____
Notary Public, State of Texas

Exhibit "A"