IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| SUSAN POLGAR | § | |
| | § | |
| VS. | § | |
| | § | |
| UNITED STATES OF AMERICA | § | |
| CHESS FEDERATION, INC., | § | |
| and | § | |
| BILL GOICHBERG, JIM BERRY, | § | |
| RANDY BAUER, and | § | |
| RANDALL HOUGH, all Individually and | § | |
| in their Representative Capacities as | § | C.A. NO. 5-08CV0169-C |
| Members of the Executive Board of the | § | |
| United States of America Chess Federation; | § | |
| BILL HALL, Individually and in his | § | |
| Representative Capacity as Executive | § | |
| Director of the United States of America | § | |
| Chess Federation; BRIAN MOTTERSHEAD; | § | |
| HAL BOGNER; CHESS MAGNET, L.L.C.; | § | |
| CONTINENTAL CHESS INCORPORATED; | § | |
| JEROME HANKEN; BRIAN LAFFERTY; | § | |
| SAM SLOAN; KARL S. KRONENBERGER; | § | |
| and KRONENBERGER BURGOYNE, LLP | § | |

## BRIEF IN SUPPORT OF KRONENBERGER BURGOYNE, LLP AND KARL S. KRONENBERGER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Submitted by,

William P. Huttenbach
State Bar No. 24002330
HIRSCH & WESTHEIMER, P.C.
700 Louisiana, 25th Floor
Houston, Texas 77002-2772
(713) 220-9184 / (713) 223-9319 FAX
Email: phuttenbach@hirschwest.com

**ATTORNEY-IN-CHARGE FOR DEFENDANTS,
KARL S. KRONENBERGER AND
KRONENBERGER BURGOYNE, LLP**

1

# TABLE OF CONTENTS

**Page**

SUMMARY OF MOTION ................................................................................... 2

STANDARD FOR SUMMARY JUDGMENT ....................................................... 3

UNDISPUTED FACTS .................................................................................... 3

    A.    Kronenberger was engaged by the USCF. ........................................... 4

    B.    Kronenberger begins investigating as requested by the USCF. ........... 5

ARGUMENTS AND AUTHORITIES ................................................................. 8

    A.    Defendants were never Plaintiff's attorney. ........................................ 8

    B.    California law demonstrates that Kronenberger was
           never Plaintiff's attorney in her individual capacity. ......................... 10

    C.    Texas law also demonstrates that Kronenberger was
           never Plaintiff's attorney in her individual capacity. ......................... 12

    D.    Polgar's own statements made in various email
           communications and/or other postings demonstrate
           that Polgar did not believe that Karl Kronenberger
           and/or Kronenberger Burgoyne, LLP, were acting
           as her attorneys. At a minimum, Plaintiff should be
           estopped from claiming to the contrary. ........................................... 21

    E.    Legal Malpractice. ........................................................................ 23

    F.    Even though Polgar's sole claims against Kronenberger
           appear to be legal malpractice and fiduciary duty claims,
           in an abundance of caution, Kronenberger requests a
           traditional and/or "no-evidence" summary judgment on
           all the remaining claims to the extent that such claims
           are against Kronenberger and Kronenberger Burgoyne, LLP. ........... 24

    G.    Polgar has released Kronenberger from all claims in a
           March 2, 2009 settlement agreement. ............................................... 28

    H.    Plaintiff's remaining claims fail for other reasons. ........................... 29

    I.    Attorneys' Fees ............................................................................. 36

CONCLUSION ............................................................................................. 37

# TABLE OF AUTHORITIES

Page

**Federal Cases**

*Anderson v. Consol. Rail Corp.*, 297 F.3d 242 (3d Cir. 2002).......................................................3
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...............................................................3
*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986).....................................................3
*Competitive Technologies v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118 (N.D. Cal. 2003)....................27
*Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967) ...............................................................................30
*Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019 (9th Cir. 2008).......27
*Flores v. Emerich & Fike*, 416 F. Supp. 2d 885 (E.D. Cal. 2006) .............................................27
*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)...................................................................30, 31
*Heck v. Humphrey*, 512 U.S. 477 (1994)...........................................................................................28
*J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*,
   76 F.3d 1245 (1st Cir. 1996)............................................................................................3
*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)...............................................29, 30, 33, 34
*Rosenblatt v. Baer*, 383 U.S. 75 (1966)...........................................................................................32
*Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769 (2007) ..................................................................3
*St. Amant v. Thompson*, 390 U.S. 727 (1968) .................................................................................34
*Streber v. Hunter*, 221 F.3d 701 (5th Cir. 2000) ...........................................................................23
*Synergy Tech & Design Inc. v. Terry*, 2007 WL 1288464 (N.D. Cal. May 02, 2007).................10
*Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431 (5th Cir. 1987)...........................................30

**State Cases**

*Alexander v. Turtur & Assoc.*, 146 S.W.3d 113 (Tex. 2004) ..........................................................23
*Belo Corp. v. Publicaciones Paso Del Norte, S.A. de C.V.*, 243 S.W.3d 152
   (Tex. App.—El Paso 2007, n.p.h.) ................................................................................35
*Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780 (Tex. 2006)......................23
*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002).......................................................................34, 35
*Bidna v. Rosen*, 19 Cal. App. 4th 27 (1993)....................................................................................28
*Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999).................................................................................13
*Carr v. Brasher*, 776 S.W.2d 567 (Tex. 1989).........................................................................29, 33
*Casso v. Brand*, 776 S.W.2d 551 (Tex. 1989)..........................................................................33, 34
*Cosgrove v. Grimes*, 774 S.W.2d 662 (Tex. 1989) .........................................................................23
*Cuyler v. Minns*, 60 S.W.3d 209 (Tex. App. - Houston [14th Dist.] 2001, pet. denied)...............23
*Dearing, Inc. v. Spiller*, 824 S.W.2d 728 (Tex. App. – Fort Worth 1992, writ denied)..............13
*Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472 (Tex. 1995) .............................................30
*Fagan v. LaGloria Oil & Gas Co.*, 494 S.W.2d 624 (Tex. Civ. App. – Houston
   [14th Dist.] 1973, no writ) ...........................................................................................12
*Fisher v. Burge*, 2002 WL 788830 (Cal. App. 2 Dist 2002) .........................................................11
*Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167 (Tex.2003).....................................34
*Fox v. Pollack*, 181 Cal. App. 3d 954, 226 Cal. Rptr. 532 (Cal. Ct. App. 1986)........................10
*Freedom Newspapers v. Cantu*, 168 S.W.3d 847 (Tex. 2005).......................................................34
*Hartford Cas. Ins. Co. v. Walker Cty. Agency, Inc.*, 808 S.W.2d 681 (Tex. App. –
   Corpus Christi 1991, no writ)........................................................................................13
*Hawthorne v. Guenther*, 917 S.W.2d 924 (Tex. App. – Beaumont 1996, writ denied)...............13
*Hoover v. Larkin*, 196 S.W.3d 227 (Tex. App. – Houston [1st Dist.] 2006, pet. denied).............23
*Joe v. Two Thirty Nine Jt.V.*, 145 S.W.3d 150 (Tex. 2004) ...........................................................23

*Kelly v. Gaines*, 181 S.W.3d 394 (Tex. App. – Waco 2005)..........................................................13

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509 (Tex. 1942)...............................13

*Koo v. Rubio's Restaurants, Inc.*, 109 Cal. App. 4th 719, 135 Cal. Rptr. 2d 415
(Cal. Ct. App. 2003) ...........................................................................................................10

*McCoy v. Hearst Corp.*, 727 P.2d 711 (Cal. 1986) .....................................................................32

*Meehan v. Hopps*, 144 Cal. App. 2d 284, 301 P.2d 10 (Cal. App. 1956) ...................................11

*Mims v. Beall*, 810 S.W.2d 876 (Tex. App. – Texarkana 1991, no writ)......................................13

*O'Donnell v. Smith*, 234 S.W.3d 135 (Tex. App. - San Antonio 2007, pet. filed 11-2-07) ..........23

*Peeler v. Hughes & Luce*, 909 S.W.2d 494 (Tex. 1995).............................................................23

*Ramona Unified School Dist. v. Tsiknas,* 135 Cal. App. 4th 510 (2005) .....................................27

*Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640 (Tex. 1995) ...................................33, 34

*Responsible Citizens v. Superior Court*, 16 Cal. App. 4th 1717, 20 Cal. Rptr. 2d 756
(Cal. Ct. App. 1993) ...........................................................................................................10

*Rusheen v. Cohen*, 37 Cal. 4th 1048 (2006) ...............................................................................27

*Skarbrevik v. Cohen, England & Whitfield*, 231 Cal. App. 3d 692,
282 Cal. Rptr. 627 (Cal. Ct. App. 1991).........................................................................10, 11

*Sutton v. Reagan & Gee*, 405 S.W.2d 828 (Tex. Civ. App. - San Antonio 1966,
writ ref'd n.r.e.) ..................................................................................................................12

*Trear v. Sills*, 69 Cal. App. 4th 1341 (1999) ..............................................................................28

*Turner v. KTRK Television*, 38 S.W.3d 103 (Tex. 2000)..............................................................34

*Vinci v. Waste Management, Inc.,* 36 Cal. App. 4th 1811, 43 Cal. Rptr. 2d 337 (1995) ..............11

*WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568 (Tex. 1998) ..................................................33, 34

**Federal Rules**
Fed. R. Civ. P. 56......................................................................................................................... 3

**State Rules**
Tex. R. Evid. 511.........................................................................................................................15

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| SUSAN POLGAR | § | |
| | § | |
| VS. | § | |
| | § | |
| UNITED STATES OF AMERICA | § | |
| CHESS FEDERATION, INC., | § | |
| and | § | |
| BILL GOICHBERG, JIM BERRY, | § | |
| RANDY BAUER, and | § | |
| RANDALL HOUGH, all Individually and | § | |
| in their Representative Capacities as | § | C.A. NO. 5-08CV0169-C |
| Members of the Executive Board of the | § | |
| United States of America Chess Federation; | § | |
| BILL HALL, Individually and in his | § | |
| Representative Capacity as Executive | § | |
| Director of the United States of America | § | |
| Chess Federation; BRIAN MOTTERSHEAD; | § | |
| HAL BOGNER; CHESS MAGNET, L.L.C.; | § | |
| CONTINENTAL CHESS INCORPORATED; | § | |
| JEROME HANKEN; BRIAN LAFERTY; | § | |
| SAM SLOAN; KARL S. KRONENBERGER; | § | |
| and KRONENBERGER BURGOYNE, LLP | § | |

## BRIEF IN SUPPORT OF KRONENBERGER BURGOYNE, LLP AND KARL S. KRONENBERGER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Kronenberger Burgoyne, LLP and Karl S. Kronenberger (collectively **"Kronenberger"** and/or **"Defendants"**) hereby submit (a) this brief (the "Brief") in support of Kronenberger's Motion for Partial Summary Judgment against Plaintiff Susan Polgar (**"Polgar"**), (b) the Appendix to the Brief ("Karl S. Kronenberger App.") and (c) the Declaration of Karl S. Kronenberger in support of Kronenberger's Motion for Partial Summary Judgment and other attached summary judgment evidence.

1

## SUMMARY OF MOTION

1.      Defendants are entitled to a judgment as a matter of law on all of Plaintiff's claims against them. It is undisputed that Kronenberger was engaged by the USCF, as counsel for the USCF only, to investigate, among other things, allegations of wrongdoing by Polgar herself and her husband, as detailed in the so-called "Mottershead Report." See Exhibit A, Tab 1 (Appendix, p. 9).[1] On or about October 22, 2007, the USCF executed an engagement letter with Kronenberger that specifically identified the parties. Several weeks later, on December 1, 2007, Polgar stated in an email that Kronenberger does not represent her ("He [Kronenberger] does not represent me or Paul."). Accordingly, Polgar's legal malpractice and breach of fiduciary duty claims must fail.

2.      Plaintiff has brought claims for slander, libel, defamation and slander per se; business disparagement; tortious interference with contracts and business relationships; intentional infliction of emotional distress; negligent infliction of emotional distress; negligence and negligence per se; civil conspiracy; gross negligence; and breach of fiduciary duty/legal malpractice.[2] Plaintiff later filed an Amended Complaint and added new claims for abuse of process, indemnification, and malicious prosecution, and Plaintiff sought attorneys' fees. Polgar has provided no evidence in support of any her other claims against Kronenberger and for the various reasons more fully explained below, summary judgment is proper on all of Plaintiff's claims against Kronenberger. This motion is being filed by only these Defendants and even though it is a partial motion for summary judgment, it seeks to end all claims by and between Plaintiff and these Defendants.

---

[1]   Under California law, such an engagement agreement should be kept confidential so Defendants have redacted portions of same.

[2]   Some of Plaintiff's claims were dismissed by this Court.

## STANDARD FOR SUMMARY JUDGMENT

3.      Summary judgment is proper in a case where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1776 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary-judgment evidence that negates the existence of a material element of plaintiff's claim or (2) showing there is no evidence to support an essential element of plaintiff's claim. *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996); *see Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

4.      Summary judgment is appropriate because the pleadings and other undisputed evidence show that there is "no genuine issue as to any material fact" and Defendants are "entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (finding that the threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."); *Anderson v. Consol. Rail Corp.,* 297 F.3d 242, 247 (3d Cir. 2002) (finding that a factual dispute is "material" if it might affect the outcome of the case under governing law).

## UNDISPUTED FACTS

5.      Plaintiff is Susan Polgar ("**Plaintiff**" or "**Polgar**").

6.      Defendants are United States of America Chess Federation, Inc. (**"USCF"**), Bill Goichberg, Individually and in his representative capacity as a member of the Executive Board of the USCF, Jim Berry, Individually and in his representative capacity as a member of the Executive Board of the USCF, Randy Bauer, Individually and in his representative capacity as a member of

3

the Executive Board of the USCF, Randall Hough, Individually and in his representative capacity as a member of the Executive Board of the USCF, Bill Hall, individually and in his representative capacity as Executive Director of the USCF; Brian Mottershead; Hal Bogner; Continental Chess Incorporated; Jerome Hanken; Brian Lafferty; Sam Sloan; Karl S. Kronenberger; and Kronenberger Burgoyne, LLP.

 7. Third-Party Defendant is Paul Truong ("**Truong**").

## A. Kronenberger was engaged by the USCF.

 8. As this Court is likely aware, one of the Defendants, Sam Sloan, on October 2, 2007, filed a lawsuit styled *Sam Sloan v. Hoainhan "Paul" Truong, et al.,* Cause No. 1:07-cv-08537-DC, in the United States District Court, Southern District of New York. Sam Sloan sued many of the same parties that had been sued by Plaintiff in this lawsuit. Sam Sloan also sued Plaintiff in the New York lawsuit. See Exhibit B (Appendix, p. 59).[3] The Sam Sloan New York lawsuit was filed before the USCF engaged Kronenberger.

 9. In the Sam Sloan lawsuit, Sam Sloan alleged that Plaintiff, along with her husband, Truong, were engaging in vicious personal attacks against Sam Sloan, as detailed in the so-called "Mottershead Report."[4] Mr. Sloan alleged that Plaintiff and her husband began making thousands of internet postings that were defaming Sam Sloan. Sam Sloan claimed that Plaintiff and/or her husband were impersonating people and were making it appear that Sam Sloan had done all sorts of bad acts.[5] Sam Sloan also alleged that as a result of the personal attacks, he was not re-elected as an Executive Board member for the USCF. Meanwhile, Plaintiff and her husband were elected as board members. When Sam Sloan sued the USCF and many of its

---

[3] Defendants are not necessarily agreeing with the facts as alleged by Sloan but are attaching same to show the date it was filed and to show the accusations that were made against Polgar and Truong.

[4] See paragraph nos. 3 and 4 in Exhibit B (Appendix, p. 59).

[5] Sam Sloan repeated many of these claims in a pleading he previously filed in this case.

board members and alleged that at least two of its board members (Plaintiff and her husband) had done such alleged bad acts, it put the USCF in a delicate situation as it was faced with the situation where a former board member was suing the USCF and at least two of its current board members. Importantly, there was a clear conflict of interest between Polgar and Truong, on the one hand, and the USCF, on the other hand.

10.     Ultimately, the USCF's insurer obtained counsel to represent the USCF and several of the Defendants in the Sam Sloan New York lawsuit. Moreover, the USCF's insurer later engaged a separate counsel to represent Plaintiff and Truong. Although the New York lawsuit was eventually dismissed and appealed, Sam Sloan has stated his intention to continue to appeal the decisions made against him and/or pursue other litigation. Consequently, the USCF and many other Defendants appear to be caught between a much larger and ongoing conflict between Plaintiff and Truong and Sam Sloan.

11.     In defending the Sam Sloan litigation, the USCF began investigating the claims contained in the Mottershead Report, being made in Sloan's complaint against two of the USCF's current board members, Plaintiff and her husband, Truong. To assist the USCF in its investigation, the USCF engaged a firm with an attorney familiar with the internet issues in dispute, Kronenberger. As seen by Exhibit A, Tab 1 (Appendix, p. 9), the USCF, not Plaintiff, engaged Kronenberger. Plaintiff knew that Kronenberger was engaged for several purposes, including representing the USCF in investigating the allegations in the Mottershead Report and in the Sam Sloan litigation.

**B.     Kronenberger begins investigating as requested by the USCF.**

12.     One of the first things that Kronenberger did once engaged was to recommend that the USCF form a separate legal subcommittee, which did not contain Polgar or Truong as members, as it was unclear at the time whether or not Plaintiff and/or Truong did the alleged

5

acts; additionally, the legal subcommittee needed to confer confidentially because Polgar and Truong were potentially adverse to the USCF in the Sloan litigation. In investigating the allegations in Sam Sloan's lawsuit, Plaintiff's husband was specifically asked to deny having any involvement with the fake Sam Sloan postings, and Truong refused to so specifically deny the accusations in writing. More specifically, Kronenberger stated as follows in his letter dated November 29, 2007 to Truong:

- Formally admit or deny, in writing, whether you were involved in the "Fake Sam Sloan" postings, or had knowledge of who made such postings;

- Provide the IP address of all your home and work internet connections since 2005, or provide consent for the Board to obtain and cooperate in the Board obtaining, such IP addresses from ISP's and other entities;

- Provide all information that would support your argument that you were not located at your computer(s) at the time of alleged Fake Sam Sloan postings, to include information relating to your travel;

- Comply with the foregoing on or before **December 7, 2007**.

See Exhibit A, Tab 2 (Appendix, p. 15). Truong did not respond to the letter. Instead, Truong's wife, Polgar, began communicating with Kronenberger on behalf of her husband. Truong did not deny the claims in writing. Truong did not provide access to his computer. Truong did very little to try to demonstrate he was innocent.

13.     Instead, Truong and Polgar continued making litigation threats against the other board members. The USCF began experiencing other new issues in having a former board member, Sloan, sue the USCF and two of its current board members, and then the two current board members began threatening the other board members, and meanwhile the USCF is still having to defend many specific allegations against two current board members, Plaintiff and

6

Truong.[6] Even more unfortunate, the threatened claims became actual litigation when Plaintiff filed this lawsuit. If they were truly innocent, one would have thought that Plaintiff and Truong would have cooperated and/or better cooperated in the investigation of the claims and in defense of the claims being made by Sam Sloan.

14. Meanwhile, after the legal subcommittee was formed to address such issues, highly sensitive attorney-client privileged emails that Kronenberger sent to the legal subcommittee members appeared in Plaintiff's possession. See Exhibit A, Tab 4 (Appendix, p. 37). In the privileged emails, Kronenberger was providing legal advice to the USCF about its legal position vis-à-vis Polgar and Truong in the context of the Sam Sloan litigation. Plaintiff obtained possession of attorney-client emails. Plaintiff then refused to state how she specifically obtained the emails. Plaintiff was not a recipient of the emails, and she refused to cooperate in an investigation trying to uncover how and why she received stolen emails. One would have also thought that Plaintiff and Truong would have cooperated with regard to investigation pertaining to the stolen emails. However, instead of cooperating with the continuing investigations, Plaintiff eventually filed this lawsuit against the various defendants. Again, the filing of this lawsuit has continued to put many of the Defendants in a delicate situation of being faced with conflicting claims of being sued both by Mr. Sloan, Mr. Parker, and Plaintiff in various different proceedings. Other than the USCF and Randy Hough (whose email account was hacked into), no other defendant has brought any claims against Plaintiff.

15. On August 7, 2008, Plaintiff sued Defendants for various claims.

16. Simply put, Kronenberger was never the attorney for Plaintiff. Plaintiff has not produced any evidence to show that Kronenberger was her attorney. As seen by Exhibit A, Tab

---

[6] Plus, another Plaintiff later sued the USCF, Polgar, Truong, and others over the alleged fake Sam Sloan postings. See *See Parker v. Goichberg, et al.*, Civil Action No. 08-CV-829 (E.D. Pa. Jan. 2, 2009).

7

1 (Appendix, p. 9), the engagement letter was with the USCF only. There is no separate engagement letter with solely Plaintiff. In fact, Kronenberger was hired, among other reasons, to investigate the allegations in the Mottershead Report, and, as such, Polgar's allegations that Kronenberger represents her simply do not make sense. Further, in various emails and/or other statements, both Plaintiff and her husband have claimed that Karl Kronenberger is not their attorney. See Exhibit A, Tab 3 (Appendix, p. 18) (where, among other statements, Polgar states, "He [Kronenberger] does not represent me or Paul.").

17. For all of these reasons, summary judgment is proper on all of Plaintiff's claims against Kronenberger.[7]

## ARGUMENTS AND AUTHORITIES

### A. Defendants were never Plaintiff's attorney.

18. Under Polgar's theory, Polgar apparently believes that a corporation should not be allowed to hire an attorney to represent it when faced with alleged improper acts done by executives and/or officers of a corporation. Under Polgar's theory, she apparently believes that if an attorney is retained by an organization, the attorney also represents the officers of the organization. Consequently, an organization is apparently unable to ever investigate and/or do anything about possible misconduct by an executive and/or board member. Such an argument has no legal support and/or authority.

19. Indeed, Polgar filed suit against Karl Kronenberger and his firm likely as a result of her displeasure with Kronenberger's request for information from Polgar and/or her husband, Truong, and Kronenberger's subsequent investigation done at the request of his client, the USCF.

---

[7] Kronenberger has had to report the claims to its insurance company. Further, Kronenberger asserts that Plaintiff's claims were filed in an attempt to conflict Kronenberger out of the California Action and to intimidate Kronenberger, as this lawsuit was served just hours before Kronenberger was due to present facts regarding Truong's alleged wrongdoings to the USCF Board of Delegates.

8

The USCF had tried to get Truong to admit or deny various claims that were being made against him. More specifically, Kronenberger requested that Truong deny being involved with fake Sam Sloan postings and provide documents or information to support such an anticipated denial. See Exhibit A, Tab 2 (Appendix, p. 15). The USCF, through Kronenberger, also was not able to get Truong to cooperate. Plaintiff Polgar sent a letter to Kronenberger that was not responsive to the specific requests of Truong in Kronenberger's letter. Plus, the USCF was later unsuccessful in trying to take Truong's deposition in Texas under a Rule 202 proceeding. Truong and Polgar were both asked to provide depositions. Both Truong and Polgar refused to attend depositions. Consequently, the USCF was unable to take sworn testimony from Polgar and Truong. To this date, Truong still has not specifically denied the claims and/or denied that he had any involvement with any of the fake Sam Sloan postings under oath.

20.     In retaliation, Polgar filed this lawsuit and sued not only USCF but its attorneys, Kronenberger. Polgar has provided no evidence that she was ever the client of Kronenberger. Indeed, the engagement agreement itself states that the firm was retained by the USCF. See Exhibit A, Tab 1 (Appendix, p. 9). In various statements, Polgar stated that Kronenberger was not her attorney but instead was the attorney for the USCF. See Exhibit A, Tab 3 (Appendix, p. 18). Notwithstanding such statements, Polgar still has sued Kronenberger to improperly harass same and/or in an impermissible attempt to try to disqualify Kronenberger from continuing the investigation and from representing the USCF in the California Action.[8]

---

[8]     Plaintiff recently filed a motion to disqualify Kronenberger in the California proceeding.

9

**B.** **California law demonstrates that Kronenberger was never Plaintiff's attorney in her individual capacity.[9]**

21.    The California court in *Synergy Tech & Design Inc. v. Terry*, 2007 WL 1288464 at *7 (N.D. Cal. May 02, 2007) followed previously decided case law that had held, "To 'state the obvious, an attorney's duty to his or her client depends on the existence of an attorney-client relationship. If that relationship does not exist, the fiduciary duty to a client does not arise.' *Fox v. Pollack,* 181 Cal. App. 3d 954, 959 (1986) (citations omitted)." *Synergy Tech & Design Inc. v. Terry*, 2007 WL 1288464 at *7 (N.D. Cal. May 02, 2007).

22.    Other California courts have held that the question of whether an attorney-client relationship exists is one of law. *Koo v. Rubio's Restaurants*, 135 Cal. Rptr. 2d 415 (Cal. Ct. App. 2003). "An attorney-client relationship is not created by the unilateral declaration of one party to the relationship. (See *Fox v. Pollack*, 181 Cal. App. 3d 954, 959, 226 Cal. Rptr. 532 [individuals cannot unilaterally create an attorney-client relationship without the agreement of the attorney].) Rather, the relationship can only be created by contract, express or implied. (*Responsible Citizens v. Superior Court*, 16 Cal. App. 4th 1717, 1732, 20 Cal. Rptr. 2d 756 (Cal. Ct. App. 1993); *Fox v. Pollack, supra,* 181 Cal. App. 3d at p. 959, 226 Cal. Rptr. 532.)" *Koo v. Rubio's Restaurants* 135 Cal. Rptr. 2d 415, 423 (Cal. Ct. App. 2003).

23.    A similar situation was before the California court in *Skarbrevik v. Cohen, England & Whitfield*, 231 Cal. App. 3d 692, 282 Cal. Rptr. 627 (Cal. Ct. App. 1991). There, a minority shareholder accused the corporation's attorney of professional negligence and conspiracy to defraud by diluting his interest in the corporation. The shareholder contended that the attorney wrongfully failed to notify him of a proposal to amend the corporate articles which

---

[9]    Although Defendants believe Exhibit A, Tab 1 does not apply to Plaintiff as the client was the USCF, if this Court somehow feels that such agreement applies, then this Court should apply California law to Plaintiff's claims against Kronenberger. California law should also apply as Kronenberger is a California lawyer and did the vast majority of his legal work in California.

10

caused additional shares of stock to be issued, diluting his ownership interest from 25 percent to 4.7 percent. The California court concluded that "[a]n attorney representing a corporation does not become the representative of its stockholders merely because the attorney's actions on behalf of the corporation also benefit the stockholders. . . ." ( *Id.* at p. 703, 282 Cal. Rptr. 627; see also *Vinci v. Waste Management, Inc.* (1995) 36 Cal. App. 4th 1811, 1815, 43 Cal. Rptr. 2d 337 [court held that even if the plaintiff was the sole shareholder of a corporation injured by a competitor's business practices, he lacked standing to sue because: "The party directly injured by [defendant's] conduct was not plaintiff, an individual, but Vinci Enterprises, Inc., a corporation. The remedy lies with the corporation, not the shareholder, even if the injured shareholder is the sole shareholder. [Citations.] In fact, to allow a shareholder to sue on his own behalf would run the risk of double recovery-once to the shareholder and once to the corporation."].) See *Fisher v. Burge*, 2002 WL 788830 at *8 (Cal. App. 2 Dist 2002).

24.     Another California court ruled that, "Appellant has not cited, nor have we found, any case holding that an attorney for a corporation is disqualified from representing it in an action brought by it against one of its officers, nor that in such an action the attorney may not use information received from such officer in connection with company matters. The attorney for a corporation represents it, its stockholders and its officers in their representative capacity. <u>He in no way represents the officers personally.</u> It would be a sorry state of affairs if when a controversy arises between an attorney's corporate client and one of its officers he could not use on behalf of his client information which that officer was required by reason of his position with the corporation to give to the attorney." See *Meehan v. Hopps*, 144 Cal. App. 2d 284, 301 P.2d 10, 14 (Cal. App. 1956) (emphasis added). Accordingly, Kronenberger's representation of the

11

USCF could not have created an attorney client relationship between Kronenberger and Polgar. Thus, under California law, summary judgment is warranted.

## C. Texas law also demonstrates that Kronenberger was never Plaintiff's attorney in her individual capacity.

25.     Texas courts have long allowed corporations to pursue claims against a manager or director, recognizing how an attorney for a corporation is not automatically an attorney for the manager or director. As stated in the seminal case of *Sutton v. Reagan & Gee*, 405 S.W.2d 828, 835 (Tex. Civ. App. – San Antonio 1966, writ ref'd n.r.e.):

> ". . . Since the breach in mismanagement cases is of a duty owed to the corporation, and the primary injury is to the corporation, the right to recover therefor may be regarded as a corporate asset. When the corporation enforces the liability of the director, the amount recovered then becomes available for the benefit of all creditors, all of whom have been similarly, if indirectly, injured . . . ."

> ". . . In addition, while directors may be held liable if they retain in a responsible position a man who has shown himself dishonest or unworthy of trust, such action involves a breach of duty to the corporation, for which only the corporation or someone suing on its behalf may recover.

26.     The corporation has been injured by the actions and mismanagement of the Defendant and, as a result, the corporation has a right to seek redress. *See Fagan v. LaGloria Oil & Gas Co.*, 494 S.W.2d 624, 628 (Tex. Civ. App. – Houston [14th Dist.] 1973, no writ). If Polgar's theory is truly believed, any attorney hired by a corporation then becomes the attorney for each of the officers and directors. Under such a scenario, how can that attorney ever be allowed to investigate and/or pursue claims against officers and/or directors of a corporation? This is ludicrous. Of course a corporation can hire an attorney to investigate alleged wrongdoing by an executive or board member.[10]

---

[10]    In Defendant's retainer agreement, Defendants never agreed to represent Polgar or Truong.

27.     Under Texas law, a plaintiff asserting a cause of action for breach of fiduciary duty must prove the following:

        a.     The plaintiff and defendant had a fiduciary relationship;

        b.     The defendant breached its fiduciary duty to the plaintiff; and

        c.     The defendant's breach resulted in

              i.     injury to the plaintiff, or

              ii.     benefit to the defendant.

*See Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513-14 (Tex. 1942); *Kelly v. Gaines*, 181 S.W.3d 394, 414 (Tex. App. – Waco 2005); *Hawthorne v. Guenther*, 917 S.W.2d 924, 934-35 (Tex. App. – Beaumont 1996, writ denied); *Dearing, Inc. v. Spiller*, 824 S.W.2d 728, 733-34 (Tex. App. – Fort Worth 1992, writ denied); *Mims v. Beall*, 810 S.W.2d 876, 879-80 (Tex. App. – Texarkana 1991, no writ); *Hartford Cas. Ins. Co. v. Walker Cty. Agency, Inc.*, 808 S.W.2d 681, 687088 (Tex. App. – Corpus Christi 1991, no writ).

28.     Section XI of Plaintiff's Amended Complaint alleges that "Kronenberger and Kronenberger Burgoyne, LLP owed Polgar a duty of loyalty and many other fiduciary duties." However, Plaintiff's Amended Complaint fails to identify any of the "many other fiduciary duties" or adequately describe the nature of the duty of loyalty or any of the alleged fiduciary duties owed to Plaintiff by Kronenberger. Plaintiff's complaint further fails to describe the nature of any alleged breach other than to state that "these two Defendants engaged in conduct designed to strip Polgar of insurance benefits and a defense in litigation in which she has become involved . . . ." This conclusory statement is wholly unsupported by any proper evidence of

facts.[11]   Finally, Plaintiff's Amended Complaint as well as Plaintiff's discovery responses attached hereto wholly fail to identify how Kronenberger's alleged breach of fiduciary duty benefitted Kronenberger in any way, nor do they offer adequate factual support in explaining how any alleged breach caused Plaintiff injury.  Plaintiff failed to provide evidence to support a claim for breach of fiduciary duty against Kronenberger, and therefore summary judgment is warranted.

29.   Although Plaintiff claims that Kronenberger tried to strip her insurance proceeds from her, Kronenberger never spoke to the USCF's insurer about this; further, Polgar was never damaged as the insurance company continued to represent her and still continues to represent her to this date.  Consequently, Polgar is making frivolous claims to this Court as she was never damaged.  More concerning, though, is that all of Polgar's claims regarding the USCF's insurer arise from content that was contained in highly confidential and attorney-client privileged emails, that were stolen by Polgar's business associate and accomplice, Gregory Alexander, who, as alleged in the California Action, gave the stolen emails to Polgar.[12]  Again, the attorney-client privileged emails should have remained confidential and never been disclosed, and Polgar would not have any of this information if it weren't for the theft of these emails.  Consequently, Polgar cannot sue Kronenberger for defamation and/or any other claim as they were supposed to be private and supposed to remain private.[13]

---

[11]   Instead, a demonstrated herein, Polgar was never "stripped of insurance benefits."  Defendants request this Court to take judicial notice of the New York Sloan lawsuit and confirm that Plaintiff has been continually represented by counsel throughout said litigation.

[12]   Plaintiff may try to claim that she found them on the internet, but her accomplice has been forensically tied to the website where Polgar supposedly obtained the emails.  But for Plaintiff and Alexander stealing the emails, they would never have been made public.

[13]   Otherwise, any plaintiff could always sue the opposing counsel if the plaintiff could steal the defendant's emails that contain positions that are likely contrary to the plaintiff's position.

14

30.     Defendants also vigorously object to Polgar attempts to convert the stolen privileged emails into public emails by continually referring to them, posting them to the Internet and submitting them as exhibits to public court filings. Polgar recently attached some of these stolen emails to her Response in Opposition to Defendants' Joint Motion for Protective Order and Brief in Support [Docket 137]. Polgar's lawyer was informed early on that Defendants were not waiving the attorney-client privilege; that Polgar's counsel was in possession of stolen emails; and he should not disclose them and should return them.[14] Instead, Polgar's counsel has apparently decided to try again to make them public by filing them in the records of the Court.[15] Polgar will likely claim that they appear on the internet. However, Polgar's accomplice, Gregory Alexander, was the one that put them on the internet. Consequently, Polgar should not be able to protect her and her counsel from potential liability when she was part of this conspiracy. Notably, there is no case law that states that theft of privileged materials creates a waiver of the privilege attached to such material. There must be some affirmative, voluntary conduct that waives the privilege. See, for e.g. Tex. R. Evid. 511 ("A person upon whom these rules confer a privilege against disclosure waives the privilege if (1) he or his predecessor while holder of the privilege *voluntarily discloses or consents to disclosure* of any significant part of the privileged matter unless such disclosure itself is privileged . . . .") (emphasis added).

31.     As stated above, USCF and several other individual defendants were sued in a New York lawsuit by Sam Sloan. Sam Sloan was demanding $50 million. Sam Sloan was alleging that Polgar and Truong made thousands of false and defamatory Internet postings impersonating Sloan. See *Sloan v. Truong*, et. al., 1:07-cv-08537-DC, Complaint [Docket 1],

---

[14]    See Exhibit A, Tab 4 (Appendix, p. 37).
[15]    Defendants again object to same and ask that they be stricken from the Court's record.

¶¶3-4, attached hereto as Exhibit B (Appendix, p. 59). Sam Sloan was seeking re-election for an executive board position with the USCF, along with Truong and Polgar.

32.     Also, as previously discussed, in response to the Sam Sloan litigation, USCF began investigating the allegations of the "Fake Sam Sloan" posts as detailed in the Mottershead Report and in Sloan's complaint. In addition to the Mottershead Report, two expert reports were generated and that concluded that Susan Polgar's husband, Paul Truong, had made some of the Fake Sam Sloan postings. See Exhibits C (Appendix, p. 87) and D (Appendix, p. 90).[16] Sam Sloan alleged that both Polgar and her husband had been seeking to become Executive Board members during a time or times that Sam Sloan was running. Sam Sloan has alleged that, as a result of the defamatory internet postings, Susan Polgar and her husband were successful and he was not. In the Sam Sloan litigation, USCF obtained litigation counsel, and the USCF's insurer eventually appointed separate counsel to represent Susan Polgar and Paul Truong in the New York Sam Sloan lawsuit, as the USCF and other defendants were potential adverse to Polgar and Truong, if, in fact, Paul Truong had done the fake Sam Sloan postings.

33.     Also as previously discussed, USCF also engaged the law firm of Kronenberger Burgoyne, LLP to further investigate the matter.[17] Immediately thereafter, the USCF formed a separate legal subcommittee which consisted of the Executive Board members minus Susan Polgar and Truong, in order to preserve confidentiality vis-à-vis Polgar and Truong.[18] Kronenberger wrote a letter to Paul Truong wherein he advised Paul Truong that his firm represented the USCF and wherein he asked Paul Truong to cooperate in the defense of the Sam Sloan lawsuit. Among other things, Kronenberger asked Paul Truong to specifically deny in

---

[16]     Defendants also incorporate by reference the Mottershead report that has already been provided to this Court.

[17]     Importantly, the USCF engaged Kronenberger Burgoyne, LLP, not Karl Kronenberger directly.

[18]     The attorney-client relationship between the USCF and Kronenberger Burgoyne, LLP was memorialized via a formal retainer agreement. No retainer agreement exists by and between Plaintiff and Defendants.

16

writing that he was involved in the Fake Sam Sloan postings. Paul Truong refused to deny in writing that he had done so.

34. Such facts demonstrate that Kronenberger represented USCF and was not Plaintiff's attorney. Plaintiff knew that Kronenberger was investigating her husband. Polgar has not produced any engagement agreement that she executed allowing Karl Kronenberger and/or his law firm to represent her. She has provided no document showing that Karl Kronenberger and/or his law firm ever agreed to represent her.[19] In fact, Karl Kronenberger told her and/or her husband that he represented the USCF and did not represent her. Karl Kronenberger also later began investigating how Polgar obtained confidential and privileged emails that had been sent to the litigation subcommittee. Plaintiff had somehow obtained a copy of these confidential emails, and she has refused to state how she had gotten copies of the emails and also given conflicting stories regarding same. USCF then suspected that someone was improperly and illegally hacking into other people's email accounts and retrieving emails. Kronenberger also then requested Polgar's assistance in trying to uncover how stolen emails were appearing on the internet. Polgar refused to provide assistance with regard to this investigation. It is clear that Kronenberger was not Polgar's attorney and owned no duties to her. Thus, summary judgment is warranted on Plaintiff's breach of fiduciary duty claim and legal malpractice claim.

35. As seen by Exhibit, Tab 1 (Appendix, p. 9), Kronenberger's engagement agreement was solely with the USCF. The engagement agreement is directed to the United States Chess Federation, Inc. In the first numbered paragraph, the engagement agreement is specific as to the identification of the parties. It states:

---

[19] Even if Plaintiff could prove an attorney-client relationship, which Defendants expressly deny, any such relationship would have been with Kronenberger Burgoyne, L.L.P. and not Karl Kronenberger, individually. Therefore, any cause of action for breach of fiduciary duty and/or legal malpractice against Karl Kronenberger, personally, is inappropriate for this additional reason.

17

> This agreement, executed in duplicate with each party receiving an executed original, is made between Kronenberger Burgoyne, LLP, hereafter referred to as the "Firm," and United States Chess Federation, Inc., hereafter referred to as "Client."

See Exhibit A, Tab 1 (Appendix, p. 9). Polgar is not listed as a party to the engagement agreement. The legal services to be provided specifically include the fact that Kronenberger will be investigating the "validity of a website administrator's report" as well as undertake other things. This report was the Mottershead report. Importantly, Polgar knew that Kronenberger was being retained to investigate her own husband, and Polgar knew that Sam Sloan had alleged in his complaint that both Polgar and Truong were responsible for the Fake Sam Sloan postings. Polgar knew that Kronenberger was retained to investigate both Polgar and Polgar's husband, and that Kronenberger was not being retained to be a lawyer for Polgar and her husband.

36. In responding to discovery requests, Polgar has never produced a copy of any engagement agreement between her and Kronenberger Burgoyne, LLP, and/or Karl Kronenberger. In fact, when Polgar answered discovery, Polgar was asked in Interrogatory No. 21 [from Karl Kronenberger] and Interrogatory No 22 [Kronenberger Burgoyne, LLP], please explain all reasons why you believe Defendant was your attorney. In response, Plaintiff stated as follows:

> Please see Plaintiff's Responses to the Requests for Production from Defendants Continental Chess, Inc., Jerome Hanken, Karl Kronenberger Burgoyne, and United States of America Chess Federation, Inc. Plaintiff reserves the right to supplement this response.

See Exhibit E (Appendix, p. 102). Plaintiff has refused to state why she believes that Kronenberger was her attorney.

37.     Plaintiff was also evasive and untruthful in answering Requests for Admissions.[20] In responding to Requests for Admissions, Plaintiff denied that "Karl Kronenberger never received any payment from Plaintiff for services." See Exhibit F (Appendix, p. 134). However, as seen by Exhibit A (Appendix, p. 4), Karl Kronenberger has never received any payment from Plaintiff. If Plaintiff has any evidence to the contrary, Plaintiff needs to provide it to the Court. See also Plaintiff's responses to Requests for Admission Nos. 73 and 74. Plaintiff also denied that "an officer of an entity is a separate legal entity from the entity itself." See Plaintiff's response to Request for Admission No. 76. Plaintiff denied that she "has nothing in writing from Kronenberger that states that they are her attorneys." See Plaintiff's response to Request for Admission No. 71.[21] However, if one truly exists, where is it? Again, if Plaintiff has any such written documentation to the contrary, Plaintiff needed to provide same.

38.     Plaintiff also tries to deny that "she never signed any retainer with Kronenberger." Plaintiff may try to explain that there is somehow a binding contract between her, personally, and Kronenberger. However, Plaintiff has provided no evidence to support such an argument. Plus, if Plaintiff still continues to claim that Defendants were her attorney based on Plaintiff being an Executive Board member of the USCF, then Plaintiff would not own her claims in her individual capacity, and Plaintiff's whole lawsuit should be dismissed as Plaintiff's claims that she is represented by Kronenberger in Polgar's capacity as an Executive Board member would truly be owned by the USCF.     In other words, if Plaintiff is claiming that she, in her representative capacity, as an Executive Board member of the USCF has claims against Kronenberger because the USCF signed a engagement agreement, then Plaintiff, individually,

---

[20]     Exhibit F has Plaintiff's Responses to the Requests for Admissions from Defendant Karl Kronenberger to Plaintiff and Plaintiff's Responses to the Requests for Admissions from Defendant Kronenberger Burgoyne, L.L.P. to Plaintiff.

[21]     As seen by Exhibit A, Tab 3 (Appendix, p. 18), contrary to Plaintiff's response to Request for Admissions no. 79, there are many times that Plaintiff denied that Defendants were her attorneys.

should not have any such claims. Moreover, Plaintiff's individual reputation in her own individual capacity would not have been tarnished if she is truly suing in her capacity as an Executive Board member.[22]

39.    Plaintiff denies that "she does not have any evidence that this particular defendant ever made any statement to Plaintiff's employer, the office of the President, Chancellors, and/or Provosts of Texas Tech University." See Plaintiff's response to Request for Admission No. 59. However, Plaintiff has not provided any such evidence that Karl Kronenberger and/or his firm ever contacted same, and as seen by Exhibit A (Appendix, p. 4), Karl Kronenberger has expressly denied same.

40.    Plaintiff was asked and answered Request for Admission No. 79 as follows:

**REQUEST FOR ADMISSION NO. 79:**

Admit or deny that you have stated that Karl Kronenberger was not your attorney.

**RESPONSE:**

Deny.

See Exhibit F, Plaintiff's response to Request for Admission No. 79 (Appendix, p. 134). As seen by the documents attached as Exhibit A, Tab 3 (Appendix, p. 18), Plaintiff's answer is untruthful as Plaintiff has indeed denied that Kronenberger was her attorney, despite Plaintiff's response to this Request for Admission to the contrary. See Exhibit F (Appendix, p. 134). For these additional reasons, summary judgment is proper.

---

[22]    Plaintiff's attorneys have sued many Defendants in different capacities and Plaintiff should be held to the same standard.

20

**D.** **Polgar's own statements made in various email communications and/or other postings demonstrate that Polgar did not believe that Karl Kronenberger and/or Kronenberger Burgoyne, LLP, were acting as her attorneys. At a minimum, Plaintiff should be estopped from claiming to the contrary.**

41.     In her Amended Complaint, Plaintiff alleges that Defendants were her attorneys. These allegations conflict with Polgar's prior statements, made back at the time when Polgar was supposedly relying on Kronenberger to be her attorney, where Polgar said numerous times in emails and postings and other correspondence that she did not view Karl Kronenberger and/or his firm as her attorney. In other words, Plaintiff is now trying to claim that Kronenberger was her attorney even though she did not believe him to be her attorney back when Kronenberger was retained.

42.     For example, in an email sent December 1, 2007, Ms. Polgar stated as follows:

> Some of these issues have nothing to do with Mr. Kronenberger. Please feel free to forward all appropriate issues to Mr. Kronenberger. **He does not represent me or Paul.**[23]

See Exhibit A, Tab 3 (Appendix, p. 18) (emphasis added).[24]   This email was sent after Kronenberger  sent the November 30, 2007 letter to her husband asking for Truong's cooperation. See Exhibit A, Tab 2 (Appendix, p. 15).

43.     This email was sent during the time when Karl Kronenberger had been retained solely by the USCF. See Exhibit A, Tab 1 (Appendix, p. 9). Kronenberger had already sent the letter to Truong on behalf of the USCF asking him to do several things, and Plaintiff absolutely knew that Kronenberger was not her attorney even though she is now trying to claim to the contrary.

---

[23]     This email was sent approximately six weeks after Defendants were retained by the USCF.

[24]     Defendants do not agree with the text in the emails and object to same and are only using the emails/postings to show Plaintiff did not think Defendants were her attorneys, and such statements are admissions against her interests.

21

44.     There are many other postings and/or emails sent by Polgar that confirm that she did not view Kronenberger as her attorney. For example, in a posting on or about Thursday, January 24, 2008, Polgar stated, "I also expect them to say that **their attorney[s]** will not allow them to release all confidential information . . . . Unless everything is allowed (by the board and **their attorney(s)** . . . ." See Exhibit A, Tab 3 (Appendix, p. 18) (emphasis added).

45.     On or about Saturday, January 26, 2008, Polgar made another posting. In the posting, she talked about the USCF paying for "legal fees to our regular USCF attorney as well as Mr. Kronenberger . . . ." Again, Polgar did not refer to Kronenberger as her attorney. See Exhibit A, Tab 3 (Appendix, p. 18).

46.     On or about Monday, January 28, 2008, Polgar made a posting that discussed the litigation. In the posting, Polgar stated, "Was the USCF attorney notified of this? Did the USCF attorney authorize this?" Again, this shows that Kronenberger was acting on behalf of the USCF and not Polgar, individually, and that Polgar viewed Kronenberger as the USCF's attorney and not her attorney. See Exhibit A, Tab 3 (Appendix, p. 18).

47.     Later, Polgar referred to Kronenberger as "the USCF attorney for the board." See Exhibit A, Tab 3 (Appendix, p. 18). If Polgar truly thought Kronenberger was her attorney, surely she would have mentioned Kronenberger as "my" attorney or "our" attorney.

48.     On or about July 3, 2008, in response to an inquiry from Jack Lemoine, Polgar wrote that the USCF had "their" attorney. More specifically, Polgar stated as follows:

> They expect me to trust them and **their** attorney after he asked the board for permission to contact the insurance Chubb to try to cancel our coverage and the board voted 5-0 to allow him to do it.

See Exhibit A, Tab 3 (Appendix, p. 18) (emphasis added).[25]

---

[25]  Again, Defendants object to the substance in the emails and postings contained in Exhibit A, Tab 3, and Defendants are only offered the evidence to show how Polgar viewed Defendants as not being her attorneys.

49.     In contrast, in a posting that does not refer to Kronenberger on Friday, January 16, 2009, Polgar refers to "us or our attorneys" and in another posting that does not refer to Kronenberger on Monday, January 19, 2009, Polgar uses the phrases "me or my team of attorneys," "their attorney," and "my team attorneys." See Exhibit A, Tab 3 (Appendix, p. 18).

50.     All of these postings show Plaintiff is making frivolous claims against Kronenberger and never truly thought Karl S. Kronenberger and/or Kronenberger Burgoyne, LLP, were her attorneys. Thus, summary judgment is warranted for these additional reasons.

**E.     Legal Malpractice.**

51.     Under Texas law, a plaintiff asserting a cause of action for legal malpractice must prove the following:

        a.      The attorney owed the plaintiff a duty;

        b.      The attorney's negligent act or omission breached that duty; and

        c.      The breach proximately caused the plaintiff's injury.

*See Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 783 (Tex. 2006); *Alexander v. Turtur & Assoc.*, 146 S.W.3d 113, 117 (Tex. 2004); *Joe v. Two Thirty Nine Jt.V.*, 145 S.W.3d 150, 159 (Tex. 2004); *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995); *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989); *O'Donnell v. Smith*, 234 S.W.3d 135 (Tex. App. – San Antonio 2007, pet. filed 11-2-07); *Hoover v. Larkin*, 196 S.W.3d 227, 231 (Tex. App. – Houston [1st Dist.] 2006, pet. denied); *Cuyler v. Minns*, 60 S.W.3d 209, 215 (Tex. App. – Houston [14th Dist.] 2001, pet. denied); *Streber v. Hunter*, 221 F.3d 701, 722 (5th Cir. 2000).

52.     Defendants incorporate by reference all of the above briefing and evidence that demonstrates that Plaintiff and Defendants never entered into an attorney-client relationship. Defendant incorporates by reference the facts and arguments in the proceeding sections, as well

23

as Exhibits A (Appendix, p. 4), E (Appendix, p. 102) and F (Appendix, p. 134). Such evidence demonstrates that Defendants never owed Plaintiff a duty in her individual capacity. Plaintiff has failed to provide evidence to demonstrate how Kronenberger breached any duty of care that arose from any alleged attorney-client relationship. Plaintiff has provided no evidence to support the elements of this claim. Finally, Plaintiff has failed to provide evidence to explain how any alleged breach of duty on the part of Kronenberger caused injury Plaintiff, and therefore summary judgment is warranted.

**F.**     **Even though Polgar's sole claims against Kronenberger appear to be legal malpractice and fiduciary duty claims, in an abundance of caution, Kronenberger requests a traditional and/or "no-evidence" summary judgment on all the remaining claims to the extent that such claims are against Kronenberger.**

53.     Plaintiff has claimed that various defendants did other tortious conduct, including making various defamatory, libelous and/or slanderous internet postings and/or other statements. However, Kronenberger has not made any such postings and/or other statements. See Exhibit A (Appendix, p. 4).

54.     As seen by his Declaration, Karl Kronenberger has never communicated with Texas Tech University, Louis XVI Restaurant, Deliberate Literate LLC, Dr. Erik Moscow, Caprock Home Health Services, Giles McCrary, ODF, Inc. d/b/a Exclusive Champagne, Tamas Karpati, SYMA+SD Kft., and/or Steve Elek. These people/entities were listed in Plaintiff's interrogatory responses as alleged contracts or business relationships that various defendants allegedly tortiously interfered with. However, for example, Karl Kronenberger has never spoken with anybody at Texas Tech University. See Exhibit A (Appendix, p. 4).[26] Plus, Karl Kronenberger has not spoken with anybody else listed in the interrogatory responses.

---

[26]     As seen by Exhibit I, Texas Tech University has no record of Defendants contacting Texas Tech University (Appendix, p. 201).

55.     When asked why Plaintiff believes Kronenberger was part of a conspiracy, Plaintiff wholly refused to answer the interrogatory.  See Exhibit E (Appendix, p. 102), Plaintiff's response to Interrogatory No. 16.[27]  If Plaintiff had facts to support such a claim, Plaintiff should have so answered the interrogatory response.  Defendants were engaged by the USCF to act as an attorney for this entity.  Plaintiff was also asked for all reasons supporting her claim that Kronenberger's alleged actions were made with malice and Plaintiff again wholly refused to answer the interrogatory.  Plaintiff was also asked about any calls or other contacts made to her employer, Texas Tech University.  Plaintiff refused to respond to such a request for information.  See Plaintiff's responses to Interrogatory Nos. 16, 17, and 18.

56.     In Interrogatory No. 7, Plaintiff is asked to specifically describe all statements the Defendants have made that would subject them to a claim for defamation.  Plaintiff refused to provide an answer under oath.  See Plaintiff's responses to Interrogatory No. 7.  Plaintiff was also asked in Interrogatory No. 5 to explain all representations, statements, declarations or admissions made by Defendant.  Again, Plaintiff declined to provide any specific information.  Simply put, if Plaintiff has claims against the various particular Defendants, she needed to provide specific facts to show how each Defendant was potentially liable.  However, Plaintiff has wholly failed to provide any evidence of same.

57.     Defendants incorporate by reference their prior Motions to Dismiss for Plaintiff's Failure to State a Claim Under Fed. R. Civ, P. 12(b)(6), or in the Alternative, Motion for a More Definite Statement Pursuant to Fed. R. Civ. P. 12(e) [Docket 20 and 21] and Memorandums in Support of Motion to Dismiss for Plaintiff's Failure to State a Claim Under Fed. R. Civ, P. 12(b)(6), or in the Alternative, Motion for a More Definite Statement Pursuant to Fed. R. Civ. P.

---

[27]    Exhibit E has Plaintiff's responses to both Karl Kronenberger's and Kronenberger Burgoyne, LLP's first set of Interrogatories.

12(e) [Docket 20-2 and 21-2] wherein Defendants went through all of the claims being made by Polgar and went through all of the elements.[28] Plaintiff has failed to provide any evidence to support all of the elements for all of the remaining claims being brought by Plaintiff.

58.     Plaintiff has also failed to provide evidence to support her claims for malicious prosecution, indemnification, and abuse of process.   Karl Kronenberger and Kronenberger Burgoyne, LLP have not filed any lawsuits or counterclaims, cross-claims, etc. against Polgar in any proceeding. See Exhibit A (Appendix, p. 4). It has only been Polgar that has filed claims by and between Polgar and Kronenberger.   Consequently, any malicious prosecution and abuse of process claims should be denied as a matter of law.  Furthermore, all discovery in the California action was conducted pursuant to valid State Discovery Orders, which were briefed and argued by counsel in front of a California judge.  Polgar asks this Court to sit in judgment of the California judge who considered and eventually approved the discovery in the "John Doe" action.[29]  Polgar has provided no evidence of any "special damages" as required by Texas law. Additionally, Polgar has also failed to provide any evidence of any contract and/or other document wherein these Defendants agree to indemnify her.  Moreover, Plaintiff has provided no evidence that these Defendants had any duty to indemnify Plaintiff.  Consequently, Plaintiff's

---

[28]   Defendant could have added all of such briefing to this motion and gone through the elements.  Instead, Defendants simply incorporate by reference just as if the elements in the various causes of action had been copied and put into this briefing.  Plaintiff has failed to provide evidence to support all of the required elements of all of her claims she has brought against Defendants.

[29]   Defendants again incorporate by reference the California litigation and ask this Court to take judicial notice of same.

newly added claims for indemnification, malicious prosecution, and abuse of process should fail as a matter of law.[30]

59.     Regarding abuse of process specifically, Polgar's complaint alleges that an action in California was "unlawfully filed." (First Amended Complaint ¶70.) However, Polgar presented no evidence whatsoever to support her claim. The common law claim of abuse of process refers to the misuse of the machinery of the legal system for an ulterior motive. Competitive *Technologies v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1155 (N.D. Cal. 2003). To succeed in an action for abuse of process under California law, a litigant must establish that the defendant: 1) contemplated an ulterior motive in using the judicial process, and 2) committed a willful act in the use of that process not proper in the regular conduct of the proceedings. *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1037 (9th Cir. 2008). Thus, abuse of process only applies to judicial proceedings; furthermore, the defendant must have misused a court process for an improper purpose. *See Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (2006) ("[T]he essence of the tort [is] . . . misuse of the power of the court; it is an act done in the name of the court and under its authority for the purpose of perpetrating an injustice."); *Flores v. Emerich & Fike*, 416 F. Supp. 2d 885, 904 (E.D. Cal. 2006); *Competitive Technologies v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1155 (N.D. Cal. 2003). Abuse of process does not apply to actions taken outside of judicial proceedings that did not invoke court processes.

60.     Moreover, the initiation of a lawsuit, even for an improper purpose, cannot support a claim for abuse of process. *Ramona Unified School Dist. v. Tsiknas*, 135 Cal. App. 4th

---

[30] Defendants also incorporate by reference Defendants' Second Motion to Dismiss [Docket 112 and 113] and all of the arguments and briefing therein regarding these three additional claims Polgar has brought. As stated in said motion, Polgar has wholly failed to provide any evidence to show that these defendants brought any claims against Polgar. Defendants also incorporate by reference the replies to Plaintiff's response to Defendants' Second Motion to Dismiss. All of such additional briefing constitutes additional argument as to why the three claims should fail. A copy of the reply is attached hereto as Exhibit G. For example, Plaintiff has already brought a claim for abuse of process against Defendants in the California proceeding, and Plaintiff should not be allowed to bring the same claims in two different proceedings.

410, 520 (2005). Rather, abuse of process requires an abuse of the legal machinery (i.e. an abuse of a legal process) after the initiation of a lawsuit. Simply filing a lawsuit for an improper purpose cannot be an abuse of process. *See Trear v. Sills*, 69 Cal. App. 4th 1341, 1359 (1999); *Bidna v. Rosen*, 19 Cal. App. 4th 27, 40 (1993) (abuse of process claim concerns misuse of litigation tools once parties are in a lawsuit regardless of whether there was probable cause to commence that lawsuit in the first place); *see also Heck v. Humphrey*, 512 U.S. 477, 486, n.5 (1994) (abuse of process refers to the extortionate perversion of a lawfully initiated court process).

61.    None of the allegations in Polgar's complaint support a cause of action for abuse of process. Some of Polgar's allegations refer to actions that occurred prior to the filing of this lawsuit, and which involved no legal processes or court procedures. As discussed above, such actions cannot serve as a basis for an abuse of process claim when they did not involve court processes. Plus, Defendants have not filed any lawsuits against Plaintiff.

62.    For these additional reasons, Polgar's abuse of process claim and various other claims must fail.

## G.    Polgar has released Kronenberger from all claims in a March 2, 2009 settlement agreement.

63.    On March 2, 2009, Polgar and her husband Truong apparently entered into a settlement agreement with former USCF Executive Board member, Joel Channing ("Channing"). Channing was an Executive Board member during the time period the Polgar alleges her claims against Kronenberger arose. See Exhibit H (Appendix, p. 191). Plaintiff produced a copy of this document in responding to Requests for Production and did not designate same as confidential.

64.    This settlement agreement releases Channing "and all of his heirs, executors, administrators, corporations, business entities, personal representatives, trustees, representatives,

28

attorneys, predecessors, . . . from any and all claims debts, liabilities demand, obligations, costs, attorney's fees, actions and causes of action of every nature and character and description including any claims or action resulting form or arising out of Channing's negligence which Releasors have, may have had, or may have had in the future arising out of, or in any way connected with, Channing's service or action as a United States Chess Federation Executive Board Member or in any way with, the United States Chess Federation and arising out of any and all dealing had by and between the parties, or any nature whatsoever, at any time through date hereof and thereafter." (*Id.*) (emphasis added.)

65.     Kronenberger does <u>not</u> assert that he is or was an attorney for Channing. However, to the extent that Polgar asserts in this action that Kronenberger was an attorney for Polgar, the Channing release should serve as a release of Kronenberger. Polgar cannot have her cake and eat it too. She must either assert that Kronenberger was her counsel, in which case she has already released Kronenberger form any and all liability, or Polgar must disclaim any attorney client relationship with Kronenberger, in which case Polgar's claims against Kronenberger must fail, and summary judgment is warranted.

**H.     Plaintiff's remaining claims fail for other reasons.**

66.     To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *See Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80 (1964)). To prevail on a motion for summary judgment, a defendant must disprove at least one essential element of the plaintiff's defamation claim. *See WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568 (Tex. 1998); *Doe v. Boys Clubs of Greater Dallas,* 907 S.W.2d 472,

29

476-77 (Tex. 1995). Plus, Plaintiff has failed to provide evidence to support all of these elements.

67.     A plaintiff's status dictates the degree of fault he or she must prove to render the defendant liable. Fault is a constitutional prerequisite for defamation liability. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (holding that states may define for themselves the appropriate standard of liability for a publisher of a defamatory falsehood injurious to a private individual "so long as they do not impose liability without fault"). Public officials and public figures must establish a higher degree of fault. They must prove that the defendant published a defamatory falsehood with actual malice, that is, with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279-80 (defining the actual malice standard and applying it to public officials); *see also Curtis Pub. Co. v. Butts,* 388 U.S. 130 (1967) (applying the *New York Times* actual malice standard to public figures). *See WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568 (Tex. 1998).[31] Plaintiff has wholly failed to provide any evidence and/or otherwise demonstrate that Defendants made any defamatory, libelous and/or slanderous statements. Plaintiff has also wholly failed to provide any evidence that even if such statements were made, which Defendants vigorously deny and have not been apprised of any, that Defendants published such statements with actual malice as defined herein.

68.     The question of public-figure status is one of constitutional law for courts to decide. *See Rosenblatt v. Baer,* 383 U.S. 75, 88 (1966); *Trotter v. Jack Anderson Enters., Inc.,* 818 F.2d 431, 433 (5th Cir. 1987). Public figures fall into two categories: (1) all-purpose, or general-purpose, public figures, and (2) limited-purpose public figures. General-purpose public figures are those individuals who have achieved such pervasive fame or notoriety that they

---

[31]     Again, Defendants incorporate by reference their prior motion to dismiss that lists the elements of Plaintiff's other claims.

become public figures for all purposes and in all contexts. *See Gertz,* 418 U.S. at 351. Limited-purpose public figures, on the other hand, are only public figures for a limited range of issues surrounding a particular public controversy. *See id. See WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568 (Tex. 1998).

69.     One need only refer to Plaintiff's Amended Complaint for evidence that establishes that Polgar is a voluntary public figure. Plaintiff's Amended Complaint includes extensive details regarding her public notoriety, especially within the chess community. For example, Plaintiff's Amended Complaint alleges as follows:[32]

> "[F]or the last thirty-five years, Susan Polgar has crossed gender and national origin barriers on the international level by becoming *one of the most successful and widely known chess players in the world.* Polgar has won ten Olympic medals and four Women's World Championships, and after fifty-six games over a span of four Olympiads, she has never lost. Susan became the first female to qualify for the "Men's" World Chess Championship, thereby forcing the world chess federation to drop the word "men" from World Chess Championship. She is the only World Champion, male or female, to win the triple crown in chess (Women's World Classical, Rapid, and Blitz Championships). At the age of twenty-one, Susan Polgar was the first woman to earn the men's Grandmaster title by fulfilling all of the traditional Grandmaster requirements. She first became *ranked number one in the world at the age of fifteen and has remained ranked in the top three in the world for over the last twenty-four years.*...In 2003, the USCF honored her with the Grandmaster of the Year award, making her the first female to receive that honor. In 2004... at the 2004 Olympiad in Calvia, Spain, [Polgar won] the first ever medal in history for the United States Women's Team. She herself won the unprecedented amount of four medals at that Olympiad, two gold and two silver, including the Best Overall Performance of the entire Women's Olympiad. Through all her success, Susan Polgar has *dedicated herself, by substantial donations of her time and money, to the promotion* of the vast benefits of chess among youth and especially young women. She is founder of the Susan Polgar Foundation, a nonprofit organization to promote chess throughout the U.S. for youth of all ages, especially young women. She is sponsor and organizer of the prestigious annual Susan Polgar National Invitational for Girls Championship, Susan Polgar World Open Chess Championship for Girls, Susan Polgar World Chess Challenge for Boys, Susan Polgar National Open Chess Championship for Girls, Susan Polgar National Chess Challenge for Boys, the NY City Mayor's Cup and SPICE Cup. *She has written chess books published in several different*

---

[32]     Defendants do not agree with all of these facts, and Defendants are only providing same to support the argument that Plaintiff, herself, considers herself to be a public figure.

*languages and thirteen instructional chess DVDs*. Polgar has been *featured in a worldwide documentary produced by National Geographic called "My Brilliant Brain." Discussions are also underway to feature Susan Polgar in other films and endorsement contracts.* In May 2007, Texas Tech University announced it had established the Susan Polgar Institute for Chess Excellence (SPICE) and hired Polgar as its executive director and head coach of the Texas Tech Knight Raiders chess team. Polgar and her family permanently relocated to Lubbock, Texas in August 2007. Texas Tech created SPICE with the ideas of building one of the world's premier centers for chess education, research and outreach and of solidifying Texas Tech as a national chess contender. In merely one year of its existence, SPICE has experienced growth in chess scholarships at Texas Tech University and hosted the Second Annual SPICE CUP International Invitational Grandmaster Tournament in September 2008, which was the highest rated 10-player international round-robin in United States history given the caliber of the Grandmasters appearing. Texas Tech University, through the reputation and name recognition of Susan Polgar, is quickly becoming recognized as the epicenter for competitive and educational chess play and studies.

Plaintiff's Amended Complaint ¶¶ 19 - 22.

70.     To determine whether an individual is a limited-purpose public figure, the Fifth Circuit has adopted a three-part test: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *See WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568 (Tex. 1998).[33] In this case, Plaintiff and Truong chose to run for a Board member position with a national organization.

71.     Actual malice is a term of art, focusing on the defamation defendant's attitude toward the truth of what it reported. *See McCoy v. Hearst Corp.,* 727 P.2d 711, 736 (Cal. 1986). Actual malice is defined as the publication of a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279-80.

---

[33] This distinction is less important as it relates to Kronenberger as any allegedly defamatory statements, if any, would likely allegedly refer solely to issues related to her notoriety.

32

Reckless disregard is also a term of art. To establish constitutional recklessness, a defamation plaintiff must prove that the publisher "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968). *See WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568 (Tex. 1998).

72.     A defendant is entitled to summary judgment under Texas law if it can negate actual malice as a matter of law. *See Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646-47 (Tex. 1995); *Casso v. Brand,* 776 S.W.2d 551, 555 (Tex. 1989). A libel defendant can negate actual malice by presenting evidence that shows he or she did not publish the alleged defamatory statement with actual knowledge of any falsity or with reckless disregard for the truth. *See Casso,* 776 S.W.2d at 559. To negate actual malice in another case, in her affidavit, WFAA reporter Valerie Williams detailed her belief that all of the reports she made were true and set forth the basis of those reports. Specifically, she swore that "[she] believed [her] reports accurately reflected public allegations by responsible, respected and well-informed journalists and news organizations, regarding a highly newsworthy matter and concerned an official investigation by law enforcement officers of a suspected tip-off of the Branch Davidian cult." She explained in detail the foundation of her belief by providing a chronology of the actions she took and the materials she reviewed in preparing her report. This testimony as to Williams' beliefs and the basis for them was sufficient for WFAA to meet its burden of negating actual malice. *See Randall's Food Mkts., Inc.,* 891 S.W.2d at 646-47; *Casso,* 776 S.W.2d at 559; *Carr v. Brasher,* 776 S.W.2d 567, 571 (Tex. 1989). As McLemore presented no proof controverting these specific assertions, WFAA established as a matter of law that it did not act with actual malice in reporting the ATF's investigation into why the Branch Davidian raid failed, and

33

therefore WFAA was entitled to summary judgment on McLemore's defamation claim. *See WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568 (Tex. 1998).

73.     The summary judgment evidence, together with Plaintiff's own pleadings, establishes that Plaintiff was a public figure. As a public figure, Plaintiff has the burden to establish that any defamatory statements were made with actual malice. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 573 (Tex. 1998). A defendant is entitled to summary judgment under Texas law if it can negate actual malice as a matter of law. See *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646-47 (Tex. 1995); *Casso v. Brand,* 776 S.W.2d 551, 555 (Tex. 1989). A defendant can negate actual malice by presenting evidence that shows he or she did not publish the alleged defamatory statement with actual knowledge of any falsity or with reckless disregard for the truth. *See Casso,* 776 S.W.2d at 559.

74.     When a claim for defamation is based on individual statements, actual malice is defined as publishing a statement with knowledge of or reckless disregard for its falsity. *N.Y. Times,* 376 U.S. at 279-80; *Turner v. KTRK Television,* 38 S.W.3d 103, 120 (Tex. 2000); *Bentley v. Bunton,* 94 S.W.3d 591 (Tex. 2002); *see Freedom Newspapers v. Cantu,* 168 S.W.3d 847,855 (Tex. 2005). Reckless disregard is a subjective standard that focuses on the conduct and state of mind of the defendant at the time of the publication. *Forbes, Inc. v. Granada Biosciences, Inc.,* 124 S.W.3d 167, 171 (Tex. 2003); *Bentley,* 94 S.W.3d at 591. It requires more than a departure from reasonably prudent conduct; mere negligence is not enough. *See Forbes, Inc.,* 124 S.W.3d at 171; *Bentley,* 94 S.W.3d at 591. There must be evidence that the defendant in fact entertained serious doubts about the truth of her publication. *Forbes, Inc.,* 124 S.W.3d at 171; *Bentley,* 94 S.W.3d at 591. For example, not investigating the facts as a reasonably prudent person would do before speaking is not, standing alone, evidence of reckless disregard for the truth. *Bentley,* 94

34

S.W.3d at 591. However, if not investigating the facts was contrary to a speaker's usual practice and motivated by a desire to avoid the truth, such action may demonstrate reckless disregard. *Id.* In establishing a defendant's reckless disregard, the plaintiff is entitled to use circumstantial evidence and may inquire about the defendant's motive and care. *Id.* However, either lack of care or an injurious motive in making a statement is not conclusive proof of actual malice, but only a factor to be considered. *Id.* at 596; *see Belo Corp. v. Publicaciones Paso Del Norte, S.A. de C.V.,* 243 S.W.3d 152 (Tex. App.—El Paso 2007, n.p.h.). Reckless disregard cannot be determined by the words alone, but must be determined by applying those words to particular circumstances. *Bentley,* 94 S.W.3d at 592.

75.     The summary judgment evidence establishes that Defendant Kronenberger was employed, in part, to investigate the claims made in the Mottershead Report—that Truong was responsible for some number of the FSS posts. Defendant Kronenberger relied on the Mottershead Report, as well as the opinions of two independent experts, in forming his conclusions. See Exhibit C (Appendix, p. 87) and D (Appendix, p. 90).[34] Defendant Kronenberger was asked to state his opinion before a delegate's meeting, in a report to Kronenberger's client. The summary judgment evidence reveals that any allegedly defamatory statement alleged by Plaintiff must have derived from that delegates meeting. Thus, Defendant had a reasonable basis for forming his opinions.

76.     Plaintiff also wholly fails to explain why any such statements and/or opinions should allow her to bring claims for defamation, libel, and/or slander. Any statements made at that delegate's meeting which referred to Plaintiff were merely ancillary in nature (i.e. when Plaintiff moved to Lubbock or travelled to Mexico). Even if these statements were false, which

---

[34]     The Mottershead Report was attached as Exhibit A to the United States of America Chess Federation, Inc. Response to Paul Truong's Motion Dismiss Under Rule 12(b)(1), or in the Alternative, Rule 14(a)(4) Motion to Strike Third-Party Plaintiff's Complaint and Brief in Support and is incorporated by reference.

Defendant denies, Plaintiff was not the subject of the opinions as Defendant was only speaking about Truong. Plaintiff has a copy of the transcript, and Defendant repeatedly clarified that he was not speaking about Plaintiff Polgar, but was only speaking about Truong. Again, Defendant was merely stating his opinions based on facts in various reports and other information he had learned. Plus, as more fully explained above, Kronenberger never contacted Texas Tech University, and did not cause Plaintiff to lose insurance coverage, etc. Thus, summary judgment is warranted on all of Plaintiff's claims against these Defendants.

## I.   Attorneys' Fees

77.     Plaintiff's filing of claims against the USCF's attorney has made it necessary for Kronenberger to employ the undersigned attorneys to represent them in this matter. The reasonable and necessary attorneys' fees incurred by Kronenberger for defending this case are currently in excess of $92,905.77.[35] Additional fees will accrue if counsel for Kronenberger is required to prepare for and attend a hearing on this motion, prepare a reply to any responses and/or in the event of an appeal. Kronenberger is entitled to recover reasonable attorneys' fees pursuant to Polgar stealing emails from Kronenberger to its client and then subsequently suing Kronenberger.

78.     Accordingly, Karl S. Kronenberger and Kronenberger Burgoyne, LLP request that the Court, upon ruling favor of Karl S. Kronenberger and Kronenberger Burgoyne, LLP, award Kronenberger its reasonable attorneys' fees and expenses related to the claims of Polgar in this proceeding.

---

[35]   Under Exhibit A, Tab 2 (Appendix, p. 15), if the Court decides that this retainer agreement applies to Plaintiff, the prevailing party should be awarded its attorneys' fees.

## CONCLUSION

For the foregoing reasons, Karl Kronenberger and Kronenberger Burgoyne, LLP request

that summary judgment be entered on their Motion for Partial Summary Judgment and grant a

take-nothing judgment on all of Plaintiff's claims against them and/or dismiss with prejudice all

Plaintiff's claims against Karl Kronenberger and Kronenberger Burgoyne, LLP. Alternatively,

Defendants request that if the Court does not grant a summary judgment on all of Plaintiff's

causes of action against these Defendants, that this Court grant a summary judgment on as many

of Plaintiff's claims against these Defendants that are appropriate. Lastly, Karl Kronenberger

and Kronenberger Burgoyne, LLP request that they be awarded their attorneys' fees and costs

and all other relief to which they are justly entitled.

Respectfully submitted,

By: *s/ William P. Huttenbach*
William P. Huttenbach
Federal I.D. No. 21742
State Bar No. 24002330
Hirsch & Westheimer, P.C.
700 Louisiana, 25th Floor
Houston, Texas 77002
Email: phuttenbach@hirschwest.com
Telephone: (713) 220-9184
Fax: (713) 223-9319

**ATTORNEY-IN-CHARGE FOR
DEFENDANTS, KARL S. KRONENBERGER
AND KRONENBERGER BURGOYNE, LLP**

OF COUNSEL:
HIRSCH & WESTHEIMER, P.C.
Bank of America Center
700 Louisiana, 25th Floor
Houston, Texas 77002-2772
Telephone: (713) 223-5181
Telecopier: (713) 223-9319

37

LOCAL COUNSEL:

LaFONT, TUNNELL, FORMBY, LaFONT
& HAMILTON, LLP
Bill LaFont
State Bar No. 11791000
Brent Hamilton
State Bar No. 00796696
PO Box 1510
Plainview, Texas, 79073-1510
Telephone: (806) 293-5361
Telecopier: (806) 293-5366

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served by electronic mail by the Clerk of the Court via the ECF system to all parties of record on June 11, 2009, as follows:

James L. Killion
Samantha P. Estrello
Killion Law Firm
P.O. Box 64670
Lubbock, TX 79424-4670

Sam H. Sloan
1664 Davidson Ave., Apt. 1B
Bronx, NY 10453-7877

Jeffrey B. Jones
Jones, Flygare, Brown & Wharton
P.O. Box 2426
Lubbock, Texas 79408-2426

s/ *William P. Huttenbach*
William P. Huttenbach

38